ASTROLINE COMMUNICATIONS COM-
PANY LIMITED PARTNERSHIP,
Appellant,

v.

FEDERAL COMMUNICATIONS
COMMISSION, Appellee,

Arch Communications Corp.,
Intervenor.

No. 86–1559.

United States Court of Appeals,
District of Columbia Circuit.

Argued Oct. 29, 1987.

Decided Sept. 27, 1988.

As Amended Oct. 12, 1988.

Thomas A. Hart, Jr., with whom Dan J. Alpert, Washington, D.C., was on the brief, for appellant.

David Silberman, Counsel, F.C.C. ("FCC"), with whom Diane S. Killory, General Counsel, FCC, and Daniel M. Armstrong, Associate General Counsel, FCC, Washington, D.C., were on the brief, for appellee.

Robert A. Beizer and R. Clark Wadlow, Washington, D.C., were on the brief for intervenor.

Before BUCKLEY and WILLIAMS, Circuit Judges, and LOUIS F. OBERDORFER,* U.S. District Judge for the District of Columbia.

Opinion for the court filed by District Judge OBERDORFER.

OBERDORFER, District Judge:

WTIC–TV serves Hartford, Connecticut, as an Ultra High Frequency ("UHF") television station operating on Channel 61. Arch Communications Corporation ("Arch") holds WTIC–TV's broadcast license. Until autumn of 1986, Arch was wholly owned by Arnold Chase. At that time, the Federal Communications Commission ("the Commission") approved a transfer of one hundred percent of the stock of Arch to Chase Broadcasting, Inc. ("CBI"), a corporation wholly owned by members of Arnold Chase's family; he held a five percent interest personally. The petition before us calls for review of the Commission's decision to approve this intra-family transfer.

* Sitting by designation pursuant to 28 U.S.C. § 292(a).

## I.

At the time CBI joined in the transfer application at issue, CBI's wholly owned subsidiary controlled WTIC–AM and WTIC–FM, radio stations licensed to the Hartford market. Consequently, CBI's attempt to acquire a UHF station also licensed to the Hartford community implicated a Commission rule proscribing common ownership or control of TV and radio stations in the same broadcast market:

> [n]o license for an AM, FM, or TV broadcast station shall be granted to any party (including all parties under common control) if such party directly or indirectly owns, operates, or controls one or more such broadcast stations ...

when grant of the license will create a situation in which the broadcast signals of the newly licensed station encompass the "entire community of license" of the existing station. 47 C.F.R. § 73.3555(b) (1987).

The one-to-a-market rule reflects the Commission's commitment to diversity in ownership and control of broadcast licenses in order to maximize competition, as well as to promote variety in programming sources and viewpoints. *See Multiple Ownership of Standard, FM and Television Broadcast Stations*, 22 F.C.C. 2d 306, 307 (1970), *recon. granted in part on other grounds*, 28 F.C.C. 2d 662 (1971). The Commission has also recognized, however, that UHF broadcasting has suffered from unique physical limitations rendering it inherently less competitive than VHF television. For instance, UHF stations must broadcast at higher and more costly power levels to match the broadcast capabilities of VHF stations. UHF frequencies, in addition, are more vulnerable to attenuation caused by natural obstacles such as terrain and foliage. *See Improvements to UHF Television Reception*, 90 F.C.C. 2d 1121, 1121 n. 1 (1982). In an effort to encourage the development of UHF television in spite of its inherent disabilities, the Commission has adopted an exception to its one-to-a-market rule:

> This [proscription of multiple ownership] will not apply ... to any broadcast application where grant of such application would result in the [broadcast area] of an existing or proposed UHF station encompassing the entire community of license of an existing or proposed AM or FM broadcast station that is commonly owned, operated or controlled. ...

47 C.F.R. § 73.3555, Note 4 (1987). The exception provides, further, that

> [s]uch UHF overlap or community encompassment cases will be handled on a case-by-case basis in order to determine whether common ownership, operation, or control of the stations in question would be in the public interest.

*Id.*

Appellant Astroline Communications Company Limited Partnership ("Astroline") and other petitioners challenged the Chase/CBI transfer application before the Commission. After consideration of the application and the protests, the Commission decided that CBI's proposal to acquire Arch, thus consolidating WTIC–TV with WTIC–AM and WTIC–FM, warranted approval under the Note 4 exception to the one-to-a-market rule. The Commission also denied a request for an evidentiary hearing lodged by appellant and other protestants. *See In re Application of Arnold L. Chase and Chase Broadcasting, Inc.*, FCC 86–381 (Sept. 12, 1986), 61 Rad.Reg.2d (P & F) 111 (1986) ("Commission Opinion"), Joint Appendix ("J.A.") at 733.

The Commission's decisions are challenged here by Astroline, a minority-controlled company that owns and operates a UHF television station licensed to operate in Hartford. Astroline claims that the Commission's authorization of the proposed transfer arbitrarily deviated from its established criteria for granting Note 4 exceptions. In addition, Astroline here challenges the Commission's failure to grant petitioners' request for an evidentiary hearing.

We reverse the Commission's determination that a hearing is not warranted in this case and remand for further proceedings consistent with this opinion. Our disposition renders premature any consideration of whether, on the facts found and conclusions heretofore reached by the Commis-

sion without a hearing, the circumstances in this case justified the grant of a Note 4 exception to the one-to-a-market requirements of 47 C.F.R. § 73.3555(b).

## II.

We must appraise appellant's request for a hearing in its factual context. Arnold Chase's father, David, his sister, Cheryl, and her husband, Roger Freedman, own through holding companies 95 percent of the stock of CBI; as indicated, Arnold owns 5 percent.[1] CBI, in turn, owns and operates radio stations WTIC–AM and WTIC–FM in Hartford, Connecticut, which stations are licensed to CBI's wholly owned subsidiary, The Ten Eighty Corporation ("Ten Eighty").[2]

At the time the transfer application at issue was filed, Arnold Chase held all of the stock of Arch. In and around 1981, while acting as president of Arch, Arnold also served as program director of WTIC–FM in Hartford. At the same time, Arnold held a 5.445 percent ownership interest in Ten Eighty, holder of the licenses for WTIC–AM and WTIC–FM.

In 1981, Arnold entered Arch in a competition for a permit to construct and operate a UHF television station broadcasting on Hartford's Channel 61. After the comparative hearing process had commenced, but before the Commission had issued a ruling, the proceeding was settled by agreement among the competing applicants. Arch's application to construct and operate Channel 61 was granted in September of 1983. Arch began operations on program test authority at Channel 61 one year later, and the station was officially licensed on March 29, 1985.

When originally seeking the UHF license for Arch, in apparent deference to the one-to-a-market rule, Arnold had proposed to sever his employment ties as program director of WTIC–FM and to divest his 5.445 percent ownership interest in Ten Eighty in the event that his application for the Channel 61 permit was granted. In 1984, after Arch won the UHF license but before operations had commenced, Arnold petitioned the Commission for relief from the divestment requirement. Arnold argued that amendments in the Commission's attribution of ownership rules made after the permit for Channel 61 had been awarded to him rendered his 5.445 percent interest in Ten Eighty noncognizable for multiple ownership purposes. The Commission agreed, concluding that so long as Arnold severed his employment relationship with WTIC–FM it was unnecessary for him to divest his relatively small interest in Ten Eighty to comport with the one-to-a-market rule.

Also in 1984, the Commission granted Arch's request for authorization to change the television station's call letters from "WETG(TV)" to "WTIC–TV," paralleling the call letters used by CBI's Hartford AM and FM stations. The change necessitated a Commission waiver of a regulation prohibiting the assignment of common call signs to stations in different broadcast services unless those stations are commonly controlled. *See* 47 C.F.R. § 73.3550(i). In the course of pursuing that petition, Arch disclosed to the Commission that David Chase and Cheryl Chase Freedman had "tentatively decided to acquire a substantial equity interest in Arch." Commission Opinion, J.A. at 739, 61 Rad.Reg. (P & F) at 125. Nevertheless, Arnold and CBI main-

---

**1.** CBI is a wholly owned subsidiary of Chase Communications, Inc. Chase Communications, Inc. is the wholly owned subsidiary of D.T. Chase Enterprises, Inc. David Chase owns 51.98 percent of the stock of D.T. Chase Enterprises. Cheryl Freedman, David's daughter and Arnold's sister, owns 42.575 percent and Arnold owns 5.445 percent. David and Cheryl are officers of all of these affiliated corporations. *See* J.A. at 6–7.

**2.** CBI also holds a controlling interest in radio and television broadcast licensees in Bay City,

Michigan, and in Stamford, Connecticut. *See* J.A. at 70. In addition, Chase Communications, Inc., CBI's parent corporation, holds, through a wholly owned subsidiary, one hundred percent of the stock of Southeast Cable Television Systems, Inc., which owns a non-controlling interest in Telecommunications, Inc., an operator of numerous cable television systems. Also through a wholly owned subsidiary, Chase Communications, Inc. holds a non-controlling interest in a Waukesha, Wisconsin, cable television broadcaster. *See id.* at 71.

tained during the Note 4 transfer proceeding presently at issue that the family's 1984 plans to consolidate Arch and CBI were not "finalized" until the autumn of 1985, after Arch's WTIC–TV had realized substantial first-year losses. *Id.*

Undisputed facts reveal that the working relationship between CBI and Arch was quite close after the UHF station commenced full operation. The radio and television stations were not only controlled by father and son, respectively, but the stations also shared operations, finances, and services. The UHF and AM/FM stations engaged in cross-advertising, utilized the same sales representatives, and employed the same law firm. *See id.* at 126. In addition to their shared interest in CBI, Arnold and David were partners in family ventures, including limited partnerships from which Arch's UHF station leased its transmitter and technical facilities. *See id.* at 123.

At the time that Arch applied for the Channel 61 construction permit, it estimated that it would cost approximately $3 million to build and operate WTIC–TV for one year, including a $500,000 program budget. Actually, the state-of-the-art facility cost more than $12 million. Moreover, Arch acquired top of the line programming, including expensive syndicated programs. As a result, Arch claimed, in its first twelve months on the air it incurred operating losses of $4,700,000, not including depreciation or provision for Arnold's salary. Arch recorded an actual deficit of $5,700,-000 for the year and had no reason to expect that future losses would not be comparable. Indeed, Arch maintained, its financial situation would have been worse had it not received certain interest-free loans from Arnold, its sole shareholder.[3]

On October 29, 1985, Arnold entered into a contract to transfer all outstanding Arch stock to CBI for a purchase price of one million dollars. The contract recited that, since its formation in 1979, Arch had incurred substantial book and tax losses and

required "significant financial assistance" to develop a viable, operating UHF station. Stock Purchase Agreement, J.A. at 19. The Agreement also recited that "the Purchaser [CBI] and its shareholders [David Chase and the other Chase family members] have rendered and continue to stand ready to offer such financial assistance under certain circumstances." *Id.* The contract further recited that CBI, as purchaser, "has extensive assets, expertise and experience in the communications industry which would inure to the benefit of an operating commercial independent UHF television station in Hartford." *Id.* The contract was signed for Arch by Arnold and for CBI by its executive vice president, Cheryl (the daughter of David and the sister of Arnold). Under the terms of the transfer, Arnold would rise to the position of Chief Executive Officer of CBI and would be paid an average of $300,000 a year for the next three years. *Id.* at 20.

### III.

Challenging this transfer agreement on appeal, Astroline argues that its "Petition for Evidentiary Hearing" before the FCC warranted further investigation as to four claims: (1) that not Arnold Chase alone but the Chase family, either as a unit, through David, or through CBI, exercised *de facto* control of Arch both at the time Arch won the UHF license and when CBI and Arnold applied for a Note 4 consolidation; (2) that the transfer of WTIC–TV to CBI will result in an anti-competitive concentration of ownership and control within the Hartford media market; (3) that Arnold made misrepresentations to the Commission when he agreed to divest his holdings in CBI, upon which commitment he subsequently reneged; and (4) that Arnold intentionally squandered WTIC–TV resources in order to present a manufactured "failing company" case for winning the one-to-a-market exception available in Note 4.

---

**3.** There apparently has been no exploration of the actual source of the funds advanced by Arnold to Arch.

## A.

■ Section 309(a) of the Communications Act of 1934, as amended, directs the Commission to grant broadcast license applications when,

> upon examination of such application and upon consideration of such other matters as the Commission may officially notice, [it] shall find that public interest, convenience, and necessity would be served by the granting thereof....

47 U.S.C. § 309(a). The statute provides for evidentiary hearings to aid the Commission in furthering its mandate to promote the public interest. Parties challenging an application by means of a petition to deny and who seek a hearing thereon must satisfy a two-step test established in 47 U.S.C. § 309(d)(1) & (2). At the threshold, the protesting party must submit a petition containing

> specific allegations of fact sufficient to show ... that a grant of the application would be prima facie inconsistent with [the public interest, convenience, and necessity].

47 U.S.C. § 309(d)(1). The Commission must perform section 309(d)'s threshold inquiry on the basis of the petitioner's allegations alone: the Commission is limited to consideration of the petition and its supporting affidavits. Moreover, in evaluating a request for an evidentiary hearing under section 309(d)(1), the Commission must proceed "on the assumption that the specific facts set forth [in the petition] are true." *Citizens for Jazz on WRVR v. FCC*, 775 F.2d 392, 397 (D.C.Cir.1985). As we elaborated in *Gencom, Inc. v. FCC*, 832 F.2d 171 (D.C.Cir.1987):

> The Commission's inquiry at this level is much like that performed by a trial judge considering a motion for a directed ver-

dict:[4] if all the supporting facts alleged in the affidavits [sic] were true, could a reasonable factfinder conclude that the ultimate fact in dispute had been established. *See Citizens for Jazz*, 775 F.2d at 397.

832 F.2d at 181.

■ If the Commission determines that the petition to deny satisfies the threshold standard, the inquiry proceeds to a second phase. Having found that the petitioner has alleged a *prima facie* inconsistency with the public interest, the Commission determines whether, "on the basis of the application, the pleadings filed, or other matters which it may officially notice[,] ... a substantial and material question of fact is presented." 47 U.S.C. § 309(d)(2); *see also Gencom*, 832 F.2d at 181. Should the Commission conclude that such a question of fact has been raised, or if it cannot, for any reason, find that grant of the application would be consistent with the public interest, it should conduct a hearing in accordance with 47 U.S.C. § 309(e). *See* 47 U.S.C. § 309(d)(2).[5]

The Commission enjoys wider latitude in its determination whether the record as a whole presents a substantial and material question of fact warranting a hearing under section 309(d)(2). *See Gencom*, 832 F.2d at 181. In this second phase, the Commission may consider the entire record, weighing the petitioner's evidence against facts offered in rebuttal. Moreover, the Commission "may determine how much weight to accord disputed facts based on the record before it." *Id.* Such analysis permits the Commission to determine "'whether the totality of the evidence arouses a sufficient doubt on the point that

---

**4.** More appropriately, a motion for summary judgment or a motion for judgment on the pleadings pursuant to Fed.R.Civ.P. 12(c).

**5.** Section 309(e), as amended (most recently by Public Law No. 98–549, October 30, 1984), provides that

> [i]f ... a substantial and material question of fact is presented ..., [the Commission] shall formally designate the application for hearing on the ground or reasons then obtaining....

47 U.S.C. § 309(e). Subsection (e) further provides:

> Any hearing subsequently held upon such application shall be a full hearing in which the applicant and all other parties in interest shall be permitted to participate.... [T]he burden of proof shall be upon the applicant....

*Id.*

further inquiry is called for.'" *Id., quoting Citizens for Jazz,* 775 F.2d at 395.

■ As we have emphasized, Congress intended that courts play a limited role in reviewing the Commission's determinations at this second stage concerning the necessity or desirability for a hearing. *See id.; United States v. FCC,* 652 F.2d 72, 90–91 n. 87 (D.C.Cir.1980) *(en banc).* We may disturb the Commission's decision to deny Astroline's petition for a hearing only if, upon examination of the Commission's statement of reasons for denial, we determine that that decision was arbitrary or capricious. *Gencom,* 832 F.2d at 181; *Columbus Broadcasting Coalition v. FCC,* 505 F.2d 320, 324 (D.C.Cir.1974).

The *Citizens for Jazz* Court provided a homely description of the analytic boundaries we are to impose upon the Commission's discretion at this phase. There, the Commission erroneously denied a hearing request because the petitioner was unable to produce "clear, precise and indubitable" proof of the ultimate fact at issue. Speaking through (then) Judge Scalia, the Court remonstrated:

> The statute in effect says that the Commission must look into the possible existence of a fire only when it is shown a good deal of smoke; the Commission has said that it will look into the possible existence of a fire only when it is shown the existence of a fire.

*Citizens for Jazz,* 775 F.2d at 397. Accordingly, that Court reversed the Commission's denial of the hearing request. We review the Commission's decision here mindful of the restrictions thus imposed on its broad discretion.

### B.

Notwithstanding the clear mandate of section 309(d), the Commission in this case virtually ignored the issues raised by Astroline's request for an evidentiary hearing. Not only does the Commission's opinion evince no more than cursory consideration of Astroline's factual allegations, but

it also exposes the Commission's failure to proceed analytically according to the statutory inquiry we have reviewed. Indeed, the Commission fails even to cite section 309(d) or *Citizens for Jazz.*[6] Our review, however, of the Commission's refusal to grant a hearing on the four issues appellant raises here must proceed according to section 309(d)'s two-step analysis. We cannot conclude that the Commission correctly administered either phase of the mandated hearing inquiry with respect to any of appellant's four issues.

### 1.

#### (a)

Section 309(d)(1) obligated petitioners challenging the Chase consolidation before the Commission to advance "specific allegations of fact sufficient to show that ... a grant of the application would be prima facie inconsistent with" the public interest, convenience, and necessity. 47 U.S.C. § 309(d)(1). Responding to petitioners' claim that Chase intra-family dealings and the history of Arch's development raised a suspicion that *de facto* control of Arch resided not in Arnold Chase as he claimed but, surreptitiously, in the Chase family as a whole or in CBI, the Commission concluded:

> The petitioners' allegations in this regard, therefore, fall significantly short of a *prima facie* showing of a substantial question of deception. [Citation omitted.] Thus, we are unable to conclude, on the basis of all of the materials before us, that a substantial and material question has been raised as to the qualifications of these applicants to be or remain Commission licensees.

61 Rad.Reg. at 135.

■ This conclusion exposes a fundamental error in the Commission's treatment of appellant's request for a hearing: the Commission confused the threshold analysis prescribed under section 309(d)(1) with the second level question asked by section 309(d)(2).[7] Indeed, the Commission appears

---

**6.** Our *Gencom* decision had not been announced when the Commission ruled.

**7.** The Commission erred similarly in the decision reviewed in *Citizens for Jazz.* There, as the

to have omitted the first step of the hearing analysis altogether. As a result of its analytic error, the Commission never reached an articulate conclusion about whether a finding that *de facto* control of Arch resided in the Chase family, as petitioners alleged, would render the proposed consolidation *prima facie* inconsistent with the public interest.

Accordingly, we remand this action to the Commission, first, for consideration of the threshold question posed by section 309(d)(1): the Commission shall determine whether a finding that the Chase family exercised *de facto* control of Arch at or before the application at issue here would "alter the Commission's public interest calculus" if that calculus were accomplished rationally. *Gencom,* 832 F.2d at 181. We decline at this time to decide, as a matter of law, that Astroline has crossed the threshold of section 309(d) by setting forth "specific allegations of fact sufficient to show that . . . a grant of the application would be prima facie inconsistent" with the public interest, convenience, and necessity. 47 U.S.C. § 309(d)(1).

In addressing petitioners' contentions in the first instance, the Commission itself implied that proof of *de facto* control of Arch by the Chase family or by CBI could be of some relevance to determining whether the Chase consolidation would advance the public interest. The opinion suggests without elaboration that misrepresentation or lack of candor, as well as evidence that other Chase family members or CBI acted as real parties-in-interest in Arch's business affairs or in its dealings with the Commission, could disqualify Arnold and CBI from "be[ing] or remain[ing] Commission licensees." *See* 61 Rad.Reg. at 135. Yet, the Commission's cursory treatment of appellant's allegations concerning the degree of community between Arnold Chase's own business interests and those controlled by his family and CBI suggests that, despite passing references to FCC real party-in-interest and lack of candor jurisprudence, the Commission would consider it immaterial to its public interest analysis that *de facto* control of Arch possibly lay in hands other than Arnold's.

We note, however, that the one-to-a-market rule itself proscribes, as contrary to the public interest, the grant of a broadcast license to any party who "directly or indirectly owns, operates, *or controls*" another broadcast outlet in the community. 47 C.F.R. § 73.3555(b) (emphasis added). CBI and the Chase family already own and control two radio stations in the Hartford broadcast market. If they were found also to have exercised *de facto* control of Arch at the time that Arch won the UHF license, such Chase family control would appear in violation of that rule itself, just as the rule might have foiled an attempt by CBI, as licensee of Hartford WTIC–AM and WTIC–FM, to acquire the UHF Channel 61 license directly.

In addition, when Arch completed for and won the permit to construct the UHF station, it represented to the Commission that it was wholly owned and controlled by Arnold Chase. If that were the true state of affairs then, *de facto* ownership or control of Arch by the Chase family at the time that Arnold and CBI applied for the Note 4 exception would suggest that an unauthorized transfer of control had taken place after Arch had been awarded the UHF license. Such transfer would violate 47 U.S.C. § 310(d) as well as 47 C.F.R. § 73.3540(a), which together prohibit assignment of control of a station without the Commission's approval. *See Lorain Journal Co. v. FCC,* 351 F.2d 824, 829 (D.C.Cir. 1965) ("control" for purposes of § 310(d) need not be legal control; rather, it may consist of actual control), *cert. denied,* 383 U.S. 967, 86 S.Ct. 1272, 16 L.Ed.2d 308 (1966).

---

Court pointed out in reversing the denial of a hearing request, the Commission had confused section 309(d)'s second-stage inquiry, whether "a substantial and material question of fact is presented," with the ultimate question whether the facts proven establish that the "public interest, convenience, and necessity" would be served by grant of the application at issue. *See Citizens for Jazz,* 775 F.2d at 394, 396–97 (noting that the Commission had erroneously required petitioners to produce "clear, precise and indubitable" evidence in order to raise "a substantial and material question of fact").

Although we have discovered no case in which the Commission denied a Note 4 transfer application based on pre-existing *de facto* control of a station by another party or by the prospective purchaser, it has on occasion suggested that an applicant who was not the real party-in-interest would be disqualified from comparative licensing competitions. *See, e.g., KOWL, Inc.,* 49 F.C.C. 2d 962, 964 (Rev.Bd.1974); *Creek County Broadcasting Co.,* 31 F.C.C. 2d 462, 467–68 (Rev.Bd.1971). The Commission's real party-in-interest inquiry typically focuses on whether a third person "has an ownership interest, or will be in a position to actually or potentially control the operation of the station." 61 Rad.Reg. at 134, *citing KOWL, Inc., supra.*

Further, evidence of *de facto* control of Arch by the Chase family could raise questions about Arnold's candor in submissions to the Commission, including those supporting Arch's initial application for Channel 61's construction permit as well as those supporting the application for the Note 4 transfer. This Court and the Commission have noted on numerous occasions that "applicants before the FCC are held to a high standard of candor and forthrightness." *WHW Enterprises, Inc. v. FCC,* 753 F.2d 1132, 1139 (D.C.Cir.1985); *see also RKO General, Inc. v. FCC,* 670 F.2d 215, 229 (D.C.Cir.1981) (Commission may deny applications on grounds of misrepresentation or lack of candor where applicant's conduct " 'threaten[s] the integrity of the Commission's processes.' "), *cert. denied,* 456 U.S. 927, 102 S.Ct. 1974, 72 L.Ed.2d 442 (1982); *Houston Family Television Ltd.,* 58 Rad.Reg.2d (P & F) 1557, 1563 (Rev.Bd. 1984) ("The Board cannot condone the integration gamesmanship displayed ... in these proceedings."); *Second Thursday Corp.,* 11 Rad.Reg.2d (P & F) 1190, 1193–94 (1967) (setting hearing following allegation of misrepresentations to the Commission); *Tinker, Inc.,* 9 Rad.Reg.2d (P & F) 601, 602–03 (1967) (misrepresentations and other misconduct constitute cause for license revocation); *Brown Radio & Television Co.,* 4 Rad.Reg.2d (P & F) 787, 789 (1965) (character qualifications of seller and buyer are ultimate issues which can affect decision on transfer); *Radio 13, Inc.,* 4 Red.Reg.2d (P & F) 322, 324 (1965) (character qualifications of petitioner, as reflected in alleged misrepresentation and lack of candor, are ultimate issues requiring hearing).

The decisions we canvass suggest that past and present misrepresentations to the Commission about Arnold's independence from his family or about the *de facto* control of Arch could conceivably militate against grant of Arch's transfer application. Yet, we remand for analysis under section 309(d)(1) of the *prima facie* consistency of the Chase consolidation with the public interest well aware that the Commission's own jurisprudence fails to provide clear content for the term "public interest" as it is used specifically in the Note 4 context. We decline, again, to reach appellant's challenge to the merits of the Commission's decision that common ownership and control of WTIC–AM, WTIC–FM, and WTIC–TV would be in the public interest so as to justify a Note 4 grant under these circumstances. Nonetheless, appellant's complaint that the Commission impermissibly deviated from its own precedent in granting the Chase application informs the task we set for the Commission on remand.

■ The Commission has been far from consistent in articulating the standards by which it decides whether a proposed radio/UHF consolidation would compromise the public interest. The Commission relies heavily on Note 4's admonition that the UHF exception should be administered on a flexible, case-by-case basis. According to the Commission, past decisions offering putative standards for determining the public interest in Note 4 proceedings are to serve merely as "assistance in considering whether the significant service benefits to be achieved by improvement of a particular UHF service, in light of actual market conditions," warrant an exception. 61 Rad. Reg. at 132. Acknowledging the wide latitude accorded the Commission in deciding whether a proposed consolidation comports with the underlying policy of the one-to-a-market rule and its exception, we yet direct the Commission on remand to indicate

whether, and, if so, why, in its view, a finding that the Chase consolidation was not *prima facie* inconsistent with the public interest would represent a permissible extension of existing case law governing Note 4 grants.

In administering Note 4 in the past, the Commission has focused on several public interest factors. The Commission has also looked to factors other than financial need, such as the provision of a first local UHF service, integration of local broadcast experience and facilities, and increasing minority ownership. *See e.g., WEKT–TV,* 2 F.C. C. Rcd. 194, 195 (1987), *Gulf Broadcasting Co.,* 100 F.C.C.2d 238, 242 (1984). It remains unclear whether these latter policies will be sufficient in the absence of financial need. One of the most significant among these, for present purposes, relates to a presumption underlying the Note 4 exception itself: that UHF television is inherently disadvantaged among media because of its lesser capabilities and higher costs. The Note 4 exception to the one-to-a-market rule rests on a policy determination that the value of diversification of media voice advanced by the general rule is outweighed in this special case by the value of greater UHF development made possible through consolidation with other, more lucrative media enterprises. This trade-off is discernible in some decisions suggesting that the Note 4 exception should be reserved for those circumstances in which consolidation with another broadcast outlet is *essential* to the viability of a UHF station. *See, e.g., Gulf Broadcasting Co.,* 100 F.C.C.2d 338 (1984). The Commission recognized this general pattern:

> [G]rants of applications pursuant to the Note 4 exception have principally involved situations where profits from the radio station will sustain the operation of an *unprofitable* UHF facility.

61 Rad.Reg. at 132 (emphasis added), *citing Wilton E. Hall,* 68 F.C.C.2d 642 (1978); *Pacific Broadcasting Corp.,* 66 F.C.C.2d 256 (1977).

At the same time, however, the Commission has granted Note 4 exceptions where consolidation was not crucial to the very survival of a UHF station. In *Metromedia, Inc.,* 54 Rad.Reg.2d (P & F) 1469 (1983), the Commission granted a Note 4 exception to a Dallas, Texas, radio licensee. Not only was the UHF station involved not on the brink of extinction, but it had operated at what was described as a "modest" profit for several years. The Commission granted the Note 4 exception, reasoning that the consolidation would provide the UHF station with the funds necessary "as soon as possible ... [to] compete effectively in a market having an abundance of media outlets." *Metromedia,* 54 Rad. Reg.2d at 1470.

The Commission relied on *Metromedia* in the present case to support its determination that the Note 4 exception was warranted because consolidation of WTIC–TV with other Chase family stations would "hasten a UHF station's more sound financial operation and, hence, ensure its ability to offer effective, competitive UHF service to the public." 61 Rad.Reg. at 133, *citing American Public Life Broadcasting Co.,* 58 F.C. C.2d 891 (1976). The Commission announced, "[T]he application of the UHF exception is not limited to situations where it can be shown that the station in question cannot achieve profitability." 61 Rad.Reg. at 133. *See also EBCO Broadcasting, Inc.,* 55 Rad.Reg.2d (P & F) 1258, 1260 (1983) ("aid to, support of, contribution to the development of, improvement of, or sustaining of the UHF permittee"); *Jersey Cape Broadcasting,* 85 F.C.C.2d 654, 666 (1981) (Note 4 applied even though UHF station somewhat profitable because station proposed major expansion in service).

■ We recognize that prior Commission decisions do not—and, indeed, are not intended to—provide binding precedent on this issue. Even so, one can discern in many of these decisions a nexus between the proposed consolidation and some serious or unexpected financial need on the part of the UHF station, such as would be occasioned by a *force majeure.* In *Metromedia,* for example, a case relied on heavily both by the Commission and by Arch as intervenor here, an abrupt loss of the primary programming provider had left

the UHF station in urgent need of capital to fund acquisition of new programming, even though the station had operated at a profit for a period and was not found to face complete financial failure if the Note 4 consolidation application were denied.

Similarly, in *KADN Broadcasting, Inc.,* FCC No. 85–103 (released March 7, 1985), Unpublished Decisions ("Unpub. Dec.") at 1, another decision emphasized both by the Commission and by Arch, a Note 4 exception was granted where there was no finding that sure extinction was the alternative. Yet the UHF station at issue there had suffered a series of setbacks, including a failed effort to obtain network affiliation, that seriously threatened its continued profitability. A final blow came with the death of a principal who had served as an essential station employee without salary and upon whose financial support and broadcast expertise the station had depended when committing itself to a costly improvement campaign. While the Commission granted the exception in that case without requiring a showing that the UHF station could not survive without consolidation, the Commission justified the grant, at least in part, because the sudden loss of the principal, as well as the costs incurred in the improvement program, placed the station in a precarious position:

> The applicant relied heavily on the broadcast experience and financial resources provided by one of its principals. With the entirely unexpected death of that key person, that support has been lost.... [W]e conclude that the experience and the infusion of financial support from local radio broadcasters is needed to assure the viability of [the UHF station] in this small, but very competitive, market.

*KADN,* Unpub.Dec. at 4.

Appellant alleges that the Chase family and CBI controlled Arch by means of substantial contributions made by the family to support the construction and operations of Arch's WTIC–TV. Appellant maintains, further, that the entire and plentiful resources of the Chase family enterprises were available to Arch throughout its infancy. If these resources were available

before the attempt to consolidate, it is reasonable to infer that they would remain available even if there were no consolidation. In such a case, no financial concern, much less emergency, would exist to justify resort to Note 4. Grant of the exception to Arch under such circumstances would not differ materially from a decision to issue the UHF license to CBI in the first place: in either case, money would present no obstacle to Channel 61's continued pursuit of top-of-the-line facilities and programming. This result appears to divorce the Note 4 exception from its policy origins as a remedial device to encourage development of an inherently disadvantaged medium.

The Commission's decision challenged here may be understood to express a principle that financial disadvantage or ultimate viability are henceforth irrelevant, or of much diminished relevance, to determining whether a consolidation under Note 4 will serve the public interest. To the extent that the decision does so hold, the Commission's rationale could represent a significant departure from its own precedent in this area. On remand, if the Commission determines that the Chase family was from the beginning an undisclosed partner in the Arch application, then it should articulate with some precision the standards that guide its evaluation of this issue when applying Note 4 to advance the public interest. In short, we must have from the Commission a sufficiently coherent statement of principles undergirding the Note 4 exception to enable us to determine whether it has been applied to this case in a manner consistent with the Commission's own precedent.

(b)

■ We remand the *de facto* control issue to the Commission to afford it an opportunity to correct its erroneous application of section 309(d)(1)'s threshold analysis. We need no remand, however, to conclude that, if proof of pre-transfer *de facto* control of Arch by David Chase, the Chase family, or CBI would in fact alter the Commission's public interest calculus on the Chase Note 4 application, the Commission

must conduct a hearing to investigate Astroline's allegations and to make findings concerning the degree of control over Arch, if any, exercised by David Chase, by the Chase family, or by CBI from and including the time Arch won the Channel 61 UHF construction permit through the time Arnold Chase and CBI applied for the Note 4 transfer authorization.

Appellant's petition to deny alleges that the Chase family, as an economic unit acting together, through David Chase alone, or through CBI, exercised significant control over Arch throughout the period of time spanning the grant of the UHF permit to Arch and the filing of the transfer application. Appellant, along with other petitioners before the Commission, argued that Chase intra-family dealings raised substantial and material questions regarding issues of misrepresentation and lack of candor, real party-in-interest deception, and abuse of Commission process. 61 Rad. Reg. at 119–20. Concluding a brief review of undisputed facts in the record depicting the close relationship between Arch and various Chase enterprises, the Commission held:

> [N]either these facts nor any other information proffered by the petitioners in this proceeding indicate that the dealings between Arch, CBI, or its principals were anything other than arm's-length transactions. . . .

61 Rad.Reg. at 135. The Commission characterized petitioners' claims as

> speculation fall[ing] substantially short of the properly documented allegations of fact necessary to raise a substantial and material question as to whether a real-party-in-interest issue is warranted here.

*Id.* (footnote omitted). We cannot accept these patently arbitrary and capricious determinations.

The Commission did purport to consider—albeit in a piecemeal fashion—many of the factors that Astroline and other petitioners argued were indicia of *de facto* control of Arch by the Chase family. The Commission acknowledged Arnold's ownership interest in Ten Eighty, CBI's announced intention to acquire an equity interest in Arch, the commingling of business interests within the Chase family, as well as petitioners' charge that one particular individual served as an officer in both corporations. *See id.* at 135 n. 33. Further, the Commission reported but did not discuss petitioners' concern that *de facto* control is reflected in the fact that the Chase family, through a partnership, leases to Arch the land on which WTIC–TV is situated. *See id.* at 121. Moreover, appellant's Petition for Evidentiary Hearing alleged, among other things, that David had made substantial loans to Arnold throughout Arch's tenure as licensee of Channel 61. *See* Petition for Evidentiary Hearing (filed by Astroline Communications, April 22, 1986) ("Astroline Hearing Petition"), J.A. 662, 670; *see also* Stock Purchase Agreement, *supra,* J.A. at 19 (reciting that CBI "and its shareholders have rendered and continue to stand ready to offer . . . financial assistance" to Arch).

The Commission adopted the allegations concerning these intra-family loans as fact and admitted that the record, as a whole, revealed "a degree of common business interests within the Chase family." 61 Rad.Reg. at 135. Nevertheless, the Commission rejected petitioners' contention that these undisputed facts raised the substantial and material question whether the *de facto* control of Arch resided in the Chase family. The Commission determined that "[t]here is no properly supported allegation or documentation that David T. Chase or principals of CBI ever directed, or acted on behalf of, Arch or Arnold L. Chase in the operation of WTIC–TV." *Id.* We hold that the unrefuted factual record, developed even without the benefit of discovery, belies the Commission's arbitrary conclusion that appellant presented no substantial and material question of fact to warrant a hearing on the issue of the *de facto* control of Arch.

## 2.

The Commission likewise erred when evaluating appellant's request for a hearing on the allegation that the proposed

Chase consolidation would result in undue concentration of control in the Hartford media community, thus impeding the public interest and warranting denial of the transfer application.

#### (a)

Before addressing the Commission's flawed disposition of Astroline's hearing petition on the concentration issue, we scrutinize the Commission's analysis of the potential adverse effect of the consolidation on competition in the Hartford market. While declining to review the substantive merits of its determination on this issue, we conclude that the Commission failed to articulate factual findings adequate to support that decision.

In its petition for an evidentiary hearing before the Commission, Astroline contended that a Chase consolidation would pose the "patent danger of allowing a media giant to monopolize" the Hartford, and indeed the Connecticut, broadcast market. Astroline Hearing Petition, J.A. at 671. Astroline's and other protestants' petitions below recited facts showing that Chase AM and FM stations appear to be extraordinarily dominant in the Hartford area. According to a 1985 Arbitron rating, the Chase radio stations enjoy substantial popularity in the Hartford broadcast market. *See In Re Arnold L. Chase,* Petition to Deny (filed by Astroline Communications), J.A. 88, 115 (Attachment A); *id.,* Comments of Post–Newsweek Stations, Connecticut, Inc., J.A. 162, 193–95 (Exhibit A) (Arbitron ratings of top 10 radio stations in Hartford (Spring, 1985)). The audience shares of WTIC–AM, for instance, exceed its nearest AM competitor's by a large margin, both overall and in the morning and afternoon drive times. The combined market shares of WTIC–AM and WTIC–FM near 52 percent in the morning drive time, 28.2 percent in the evening drive time, and 35.9 percent overall. *See id.*

The Commission responded in an unacceptably conclusory fashion to appellant's concerns on this issue. According considerable weight to the UHF station's potential, after consolidation, to compete effectively by providing, among other things, community interest programming to consumers in the Hartford market, the Commission announced:

> [T]he substantial benefits to be gained as a result of the proposed ownership of an aural/UHF television combination will not result in a substantial threat to diversity or competition among media outlets in the Hartford market.

61 Rad.Reg. at 134. Although the market statistics we cite appear prominently in the record and are not discredited therein, *see id.* at 119 n. 11, the Commission's decision does not reflect any consideration by it of this evidence of the Chase stations' market dominance. Moreover, the Commission failed to make any findings regarding the specific size and characteristics of the Hartford market or regarding the market shares of the Chase stations relative to other broadcast outlets. Significantly, there are no findings as to the particular impact this consolidation will have on the ability of Astroline's UHF service to survive in that market.

Stating only that the Hartford market is "strong and highly competitive," the Commission announced summarily that that broadcast community could "withstand the degree of increased competition" that the transfer would generate. *Id.* at 134. The Commission articulated no particularized factual basis for this conclusion. We are unpersuaded by the Commission's *post hoc* protestations that it "was obviously aware of the amount, relative strengths and diversity of media outlets in the Hartford market ... when it concluded that the market was 'strong and highly competitive'...." Brief of the Federal Communications Commission ("Appellee's Brief") at 21 n. 17. Such awareness is not reflected in the Commission's decision. Accordingly, we remand this issue and direct the Commission to make findings, if it can do so conscientiously on the existing record, such as are necessary to support its ultimate conclusion that the proposed consolidation "will not result in a substantial threat to diversity or competition among media out-

lets in the Hartford market." 61 Rad.Reg. at 134.

Our remand for findings on this issue discovers support in the Commission's own precedent. In prior cases involving analysis of Note 4 applications, the Commission at least took note of the market shares of the radio stations with which the UHF station sought to consolidate, the number and shares of rival broadcast outlets, and the availability of cable television in the locality. *See Metromedia,* 54 Rad.Reg.2d (P & F) at 1470. Further, in *KADN Broadcasting, Inc., supra,* the Commission explicitly considered the market shares of the radio stations to be consolidated with the UHF station, the number and vitality of competing broadcast sources, and the relative size of the media market in Lafayette, Louisiana. *KADN,* Unpub. Dec. at 3–4.

The sort of evidence considered in *Metromedia* and *KADN* was apparently available to the Commission here. Brief of Intervenor at 21–22 (identifying facts pertinent to this issue that are found in the record). Yet the Commission apparently declined to weigh that evidence in reaching its determination that the Note 4 exception was warranted. Consequently, we not only remand for findings on the facts we have listed as having relevance to the competition issue, but we also direct the Commission to articulate—or, if necessary, to develop—standards to guide itself when factoring those factual findings into its public interest calculus in this case.

■ As a predicate to any fact-based conclusion concerning the effect of a Chase consolidation on competition in the Hartford broadcast community, the Commission must first identify the boundaries of that "relevant market." The Commission appears to have neglected this task altogether. Petitioners before the Commission focused, as does appellant here, on a "relevant market" comprised of those broadcasting stations primarily serving or licensed to the Hartford community. In a petition advocating denial of the Chase transfer application, Greater Connecticut Broadcasting, Inc., licensee of radio sta-

tions in Hartford and in Waterbury, Connecticut, reported:

> Although the Hartford area market may have a variety of media sources, Hartford itself has only a limited number of mass media. Only one daily newspaper specifically serves Hartford. Only 1 VHF station and 3 UHF stations (one of which is Channel 61) are licensed to Hartford. Further, only 2 independent stations (one of which is Channel 61) are licensed to Hartford.

*In re Arnold L. Chase,* Petition to Deny (filed by Greater Connecticut Broadcasting, Inc.), J.A. at 143, 158 (footnote omitted).

Arnold Chase and CBI conceive a broader market, embracing, among others, cable television services available to Hartford consumers by satellite from outside the area, as well as network and other broadcasts originating in New York, Massachusetts, and Rhode Island. The record contains a list submitted to the Commission by Arnold Chase and CBI as a definitive catalog of competitors in the Hartford media market. The Chase/CBI list includes not only the six commercial and four non-commercial television stations licensed to the Hartford/New Haven/Waterbury market, but it also names twenty-eight commercial and non-commercial stations that are licensed in adjacent markets whose signals can be received by consumers located in the Hartford community. *See* Supplemental Showing Supporting Application of UHF Exception to the Commission's "One-to-a-Market" Rule (filed by Arch/CBI) ("Supplemental Showing"), J.A. at 793, 796–99; Brief of Intervenor at 20–21. Arch also informed the Commission that "[t]he Hartford/New Haven/Waterbury market is ... heavily cabled, with cable penetration of greater than 60 percent" and that "[t]he cable system serving Hartford and several surrounding communities ... provides 36 channels of service, with converters allowing for an upgrade to 60 channels in the future." Supplemental Showing, J.A. at 799.

Arch summarizes the parties' divergent views of what constitutes the relevant market in this case:

If the focus is on where stations are licensed, then the Commission should look to the market as defined and utilized by the Commission and the industry, *i.e.*, the Hartford/New Haven/Waterbury market, with its ten licensed television stations. If, however, the focus is on what services are provided in the market, then one must look both to the stations licensed to and serving the market and to stations from adjoining or distant markets and other services, such as cable television, available in the market.

Brief of Intervenor at 21 n. 8. While the record reflects a clear dispute concerning the scope of the "relevant market," the Commission declined to resolve the disagreement by defining that market. We conclude that definition of the market relevant to this case is a necessary element of the findings here prescribed.

### (b)

Not only did the Commission neglect to articulate adequate findings of fact to anchor its conclusion that the Chase consolidation would not adversely affect competition in the Hartford media community, but it also erred in its disposition of appellant's petition for a hearing on this issue. Here, as with the control issue, the Commission failed to proceed according to the analytic framework established in section 309(d) and *Citizens for Jazz*. Accordingly, we remand to the Commission to reconsider its denial of appellant's request for a hearing on the competition issue in light of the two-step inquiry mandated by statute and by our precedents.

The Commission neglected altogether to address the question whether, assuming as true Astroline's allegations that the consolidation would inhibit competition, "a grant of the application would be prima facie inconsistent" with the public interest, convenience, and necessity. 47 U.S.C. § 309(d)(1); *see Citizens for Jazz*, 775 F.2d at 397. Specifically, we cannot approve the Commission's failure to explain whether and how evidence of extreme market concentration would relate to its generalized duty to consider anti-competitive effects of license transfers, *see United States v.*

*FCC*, 652 F.2d at 81–88, 102–04, or to its application of Commission case law governing Note 4 exceptions to the one-to-a-market rule. On remand, the Commission must indicate whether and to what extent market concentration would affect its evaluation of the "public interest" for purposes of its Note 4 calculus.

Neither does the decision reflect principled consideration of whether, in the context of the entire record, a "substantial and material question of fact is presented" on the issue of the consolidation's anti-competitive potential. 47 U.S.C. § 309(d)(2). Dismissing Astroline's petition for a hearing, the Commission announced without elaboration that

> [t]he petitioners' concerns regarding the allegedly anticompetitive aspects of this transfer lack the specificity and supporting documentation necessary to warrant further consideration.

61 Rad.Reg. at 134. We hold that the Commission failed to articulate adequately its reasons for reaching this conclusion. Should the Commission decide on remand that proof of market concentration would *prima facie* alter its public interest determination regarding the Chase consolidation, it should re-evaluate its second level hearing analysis as prescribed in section 309(d)(2).

To be sure, if the Commission's only task is to "draw factual and legal inferences from undisputed evidentiary facts," and if the technical or economic analysis necessitated by a protest will be aided little by oral testimony, the Commission acts within its discretion when it refuses to conduct a hearing involving such testimony. *Gencom*, 832 F.2d at 181. Appellant's allegations concerning the potential anti-competitive consequences of the Chase consolidation may well require only such technical or economic analysis: it is conceivable that no substantial and material dispute will arise concerning the specific facts relevant to market concentration. For example, the current market shares of WTIC–AM and WTIC–FM, the shares of other television and radio stations in the Hartford area, and the population and demographics of the

market may reduce to statistics undisputed by the parties. Nonetheless, even if no material facts are in dispute, the expert opinions produced to draw conclusions from those facts may well generate vigorous disagreement. *See United States v. FCC,* 652 F.2d at 91. In that event, the Commission might be well served to permit each party to test the credibility of an opponent's expert through cross-examination. Moreover, the Commission would almost certainly benefit from study of the expert witness' demeanor. As with any triers of fact, Commission members can better resolve a conflict in the testimony of expert witnesses

> [b]y considering and weighing the credibility and qualifications of the respective experts who have testified; the logic of the reasons given in support of their opinion; the other evidence ... which favors or opposes a given opinion; and by using [their] own experience and good judgment as reasonable and intelligent people.... [so as to] determine which of the opinions to accept as accurate.

Standardized Civil Jury Instructions for the District of Columbia, No. 3–4 (1985) (Expert Opinion–Conflict).

### 3.

Astroline, together with other protestants, alleged before the Commission that considerable expenditures made by Arch since acquiring WTIC–TV had been made with the intention of creating a financially strapped enterprise. By means of this scheme, the protestants contended, Arnold Chase attempted to qualify Arch as a "failing company," a concept deduced from Commission decisions suggesting that the Note 4 exception might be reserved for UHF stations facing financial ruin if not permitted to consolidate with other broadcast outlets in a given market.

We follow section 309(d)'s two-step analysis to review appellant's request for a hearing on this third issue. We conclude that the Commission again failed to apply the proper statutory standard and remand for reconsideration of appellant's petition for a hearing.

To satisfy the threshold inquiry under section 309(d)(1), the Commission on remand must treat "as established" the petitioners' charge that a "failing company" scheme motivated Arch's expenditures in order to determine whether that scheme would render the proposed consolidation *prima facie* inconsistent with the public interest. The manipulation of Commission procedures implicated in appellant's allegations could reflect a serious lack of candor on the part of the Chase family in its interaction with the Commission. In light of Commission jurisprudence, outlined above, regarding disqualifying misrepresentations, a grant of the Chase Note 4 application might be far less likely were appellant's allegations to prove true. Further, the Commission might well believe that the public interest would not be served by extending the benefits of a "failing company" exception to companies that sought deliberately to qualify for it.

Although neglecting on this issue to conduct the threshhold inquiry prescribed by section 309(d)(1), the Commission appears nevertheless to have addressed the question posed by section 309(d)(2), holding that appellant's "failing company" allegation did not raise a substantial and material question of fact warranting further investigation through a hearing. *See* 61 Rad.Reg. at 132–33. The Commission listed four reasons for its conclusion: (1) to the extent petitioners challenged *specific* expenditures, those expenditures are left generally to the business judgment of the licensee; (2) to the extent that petitioners challenged Arch's more general decision to run a "top of the line" operation, that decision was in the public interest; (3) the fact that grant of the Note 4 application was by no means a certainty weighed heavily against the existence of a scheme deliberately to cripple the company in order to facilitate a consolidation with CBI; and (4) the Commission believed the petitioners' allegations to be unsupported and completely speculative. *Id.*

Viewed in isolation, we could not characterize this treatment of the expenditures issue as arbitrary and capricious were the

**1572**

Commission to reach the same conclusion on remand after reconsideration following the proper analytic procedure. Nonetheless, a licensee's business discretion over expenditures cannot insulate it from a scrutiny as a matter of law when a claim such as Astroline's is raised. Surely expensive, top-flight broadcast operations are not always—nor even presumptively—in the public interest. On the other hand, given the Commission's vague, case-by-case method for granting Note 4 exceptions to the one-to-a-market rule, it might well be foolhardy for anyone to overspend in the hope that the Commission would follow any precedent, including decisions suggesting that failing UHF stations are more likely to win authorization to consolidate.

The more compelling factual question raised by Astroline's "failing company" allegation is whether family resources were available, if not committed, to underwrite Arch's ambitious development program from the station's inception, with an eye towards eventual Note 4 consolidation to recoup operating losses through tax savings and economies of scale.[8] If such funds were in fact underpinning Arch's aggressive expansion, it is conceivable that a corresponding power to control Arch resided in the funding family. The source of Arch's expenditures beyond its own reported resources is thus highly relevant to the larger issue whether *de facto* control of Arch resided elsewhere than in Arnold Chase. Accordingly, if on remand the Commission determines that a hearing is indicated to address the *de facto* control issue, appellant should remain free during such proceeding to inquire and cross-examine concerning the source of the funds expended on Arch's construction and development.

**4.**

■ Appellant alleges that Arnold Chase knowingly misrepresented to the Commission that he would divest his approximately five percent share in CBI's parent, The Ten Eighty Corporation, within a year following Arch's acquisition of Channel 61's license. The Commission again failed to conduct a proper section 309(d) analysis of appellant's hearing request, and we remand this issue along with the three others discussed herein for reconsideration in light of the Commission's statutory mandate.

The Commission's conclusion regarding the divestment issue approximates conclusions that might conceivably have been reached under an appropriate section 309(d) analysis: the opinion suggests that, even if proven true, the petitioners' allegations concerning this issue would not render a grant of the application *prima facie* against the public interest.[9] *See* 61 Rad. Reg. at 135. The Commission cited two reasons for this conclusion. First, for the Commission's purposes, "misrepresentation and lack of candor connote false statements of fact which, when made, are done so with the intent to deceive." *Id.* The Commission observed that petitioners had not made any specific factual allegations to support their assertion that Chase's statements that he intended to divest were in fact false when made. This observation reflects a fair view of Astroline's petition,

---

**8.** It is significant in this regard that Chase and CBI argued before the Commission that the proposed consolidation would advance the public interest in part *because* it would result in "certain operating efficiencies and economies of scale" and would permit CBI "immediately [to] realize tax savings on the profits of its radio stations and other entities by bringing the television station, with its net operating losses, under common ownership." 61 Rad.Reg. at 116 (footnote omitted). While we are unable to discern how such tax savings by a private corporation enhance the public interest, we note here only that the Commission did not engage this question in reaching its decision to grant the application. In reconsidering the "failing company" issue on remand, the Commission may wish to address whether and to what extent the advantages enjoyed by the "White Knight" in a Note 4 consolidation, as opposed to those accruing to the UHF station, should factor into the public interest calculus under that provision.

**9.** The Commission's obvious confusion about its section 309(d) mandate taints this otherwise tenable conclusion. The Commission includes the divestment issue among those about which it erroneously reasons: "The petitioners' allegations ... fall significantly short of a *prima facie* showing of a *substantial question of deception*." 61 Rad.Reg. at 135.

which claimed little more in this regard than that

> Arnold Chase has twice represented to the Commission that he would not participate in the ownership or operation of the radio stations. At this time, however, he remains involved in the station.

Astroline Hearing Petition, J.A. at 671–72 (footnote omitted). Astroline's petition alleged no fraudulent intent on the part of Arnold. Given the Commission's position that such intent is, for its purposes, an essential element of misrepresentation, proof of the appellant's allegations would likely not alter the Note 4 public interest calculus. In this light, it is somewhat unlikely that the petition's allegations would survive section 309(d)'s threshhold test. Nevertheless, when conducting that analysis on remand the Commission should recall that its own and this Court's precedents have treated lack of candor as a nearly sufficient reason to deny an application. *See* cases cited *supra; cf. Henderson Broadcasting Co., Inc.,* 63 F.C.C. 2d 119, 120 (1976) (failure of applicant to honor commitment to Commission "could have serious consequences").

Second, the Commission noted that changes in Commission rules subsequent to Arnold's commitment to divest his Ten Eighty holdings rendered his 5.445 percent stock ownership noncognizable under Commission attribution rules. *See* 61 Rad.Reg. at 114, 135; *Corporate Ownership Reporting and Disclosure by Broadcast Licensees,* 97 F.C.C. 2d 997, 1008–09 (1984), *modified on recon.,* 58 Rad.Reg.2d (P & F) 604 (1985). Thus, a change in FCC rules may have been sufficient to explain Arnold's later decision not to divest.

Considered in isolation, these conclusions do not reflect capricious action on the part of the Commission.[10] Had the Commission reached its decision on this issue by way of section 309(d)'s two-step analysis, we would be constrained to defer to the agency's discretion to determine that a hearing was not warranted. Nonetheless, the Commis-

sion's persistent misapplication of the statutory mandate and of our precedents compels us to remand for reconsideration of appellant's hearing request on this issue as well.

## IV.

The Commission in this case ignored its statutory mandate and the decisions of this Court establishing an analytic procedure for evaluating petitions for evidentiary hearings. To so abandon the standards that govern agency action on this or any other question is to reflect the essence of arbitrary and capricious decisionmaking. Accordingly, we remand on each of the four issues appellant raises here for principled reconsideration of the hearing question in light of 47 U.S.C. 309(d) as well as *Citizens for Jazz* and *Gencom.*

Specifically, the Commission should determine whether proof that *de facto* control of Arch lay in hands other than Arnold Chase's would render the proposed consolidation *prima facie* inconsistent with the public interest, convenience, and necessity. In making this determination, the Commission should articulate the standards that govern its evaluation of the "public interest" in the particular context of Note 4 exceptions. In addition, the Commission should indicate whether and, if so, why a finding that the Chase consolidation was not "*prima facie* inconsistent with" the public interest would represent a permissible extension of existing Note 4 case law.

If the Commission concludes that appellant has satisfied the threshold requirement of section 309(d)(1) with respect to the *de facto* control issue raised here, the Commission should conduct an evidentiary hearing and make findings concerning the degree of control, if any, exercised over Arch by David Chase, the Chase family, or CBI during the relevant time period.

Further, the Commission should conduct a section 309(d) analysis to determine if a

---

**10.** We have some difficulty with the Commission's argument that Arch's "timely disclosures" to the Commission "belie[d] any inference of any intent to conceal." 61 Rad.Reg. at 135.

The characterization of the disclosures as timely seems to assume the conclusion. But we think this error (if such it be) is not enough alone to undermine the otherwise acceptable conclusion.

hearing is indicated on the issue of whether the Chase consolidation threatens to exert an anticompetitive influence on the Hartford broadcast market. First, the Commission should indicate whether and how proof of extreme market concentration would affect its public interest analysis in the Note 4 context. Second, the Commission should reconsider whether the existing record presents a substantial and material question of fact necessitating an evidentiary hearing.

Irrespective of whether the Commission decides to hold a hearing on the market concentration issue, it should make findings of fact to support its determination of whether the consolidation would result in undue market concentration. The Commission should state, or, if necessary, develop, standards to guide itself when evaluating the impact of market concentration on the public interest. Thereafter, the Commission should consider the specific factors that we have discussed regarding the Hartford market and the competitors therein in light of these standards.

On the questions (1) whether Arch's finances were deliberately crippled in order to manufacture a "failing company" situation warranting a Note 4 exception to the one-to-a-market rule and (2) whether Arnold misrepresented his intention to divest his five percent ownership interest at the time he applied for Channel 61's construction permit, the Commission should redetermine whether its denial of appellant's hearing request remains valid in light of the two-step analysis we have discussed.

*It is so Ordered.*