77 F.3d 1399
 316 U.S.App.D.C. 220
 MOBILE COMMUNICATIONS CORPORATION OF AMERICA, et al., Appellants,
v.
FEDERAL COMMUNICATIONS COMMISSION, Appellee,
Mobile Telecommunications Technologies Corporation, Intervenor.
MOBILE TELECOMMUNICATIONS TECHNOLOGIES CORPORATION, et al., Appellants,
v.
FEDERAL COMMUNICATIONS COMMISSION, Appellee,
Cox Enterprises, Inc., et al., Intervenors.
 Nos. 93-1518, 94-1552 and 94-1553.
 United States Court of Appeals,
District of Columbia Circuit.
 Argued Dec. 8, 1995.
Decided March 8, 1996.
Rehearing and Suggestion for Rehearing En Banc Denied May 8,
1996.*
 
 [316 U.S.App.D.C. 223] Appeals of an Order of the Federal Communications Commission.
 Michael Deuel Sullivan, with whom L. Andrew Tollin, Craig E. Gilmore, Georgina M. Lopez-Ona, Washington, DC, Walter H. Alford, Atlanta, GA, John F. Beasley, Athens, GA, William B. Barfield and Jim O. Llewellyn, Atlanta, GA, were on the briefs, argued the cause, for appellants Mobile Communications Corporation of America, et al.
 Richard E. Wiley, with whom Ray M. Senkowski, Daniel E. Troy, Timothy B. Dyk and Barbara McDowell, Washington, DC, were on the briefs, argued the cause, for appellants Mobile Telecommunications Technologies Corporation and Destineer Corporation.
 Joel Marcus, Counsel, Federal Communications Commission, with whom William E. Kennard, General Counsel, and John E. Ingle, Deputy Associate General Counsel, were on the brief, argued the cause, for appellee in 93-1518. James M. Carr and Renee Licht, Counsel, Washington, DC, entered appearances.
 John E. Ingle, Deputy Associate General Counsel, Federal Communications Commission, with whom William E. Kennard, General Counsel, and Michael F. Finn and Joel Marcus, Counsel, were on the brief, argued the cause, for appellee in 94-1552 and 94-1553. James M. Carr, Washington, DC, entered an appearance.
 Richard E. Wiley, Ray M. Senkowski and Daniel E. Troy, Washington, DC, were on the brief, for intervenors Mobile Telecommunications Technologies Corporation and Destineer Corporation.
 Jonathan D. Hart, Laura H. Phillips, Robin H. Sangston and Werner K. Hartenberger, Washington, DC, entered appearances, for intervenor Cox Enterprises, Inc.
 J. Laurent Scharff, Joel M. Hamme and Robert J. Aamoth, Washington, DC, were on the brief, for intervenor Paging Network, Inc.
 E. Edward Bruce, John F. Duffy and Robert A. Long, Jr., Washington, DC, entered appearances, for amicus curiae American Personal Communications.
 Before: EDWARDS, Chief Judge, BUCKLEY and WILLIAMS, Circuit Judges.
 Opinion for the Court filed by Circuit Judge WILLIAMS.
 Opinion concurring in part and dissenting in part filed by Chief Judge EDWARDS.
 STEPHEN F. WILLIAMS, Circuit Judge:
 
 
 1
 Petitioner Mobile Telecommunications Technologies Corp. ("Mtel") received a "pioneer's preference" in 1993 as a reward for developing technology making it possible to transmit information through the airwaves much faster than had formerly been possible. See Notice of Proposed Rule Making and Tentative Decision, Amendment of the Commission's Rules To Establish New Personal Communications Services, 7 F.C.C.R. 5676, 5735-36 pp 149-51 (1992) ("Tentative Preference Order"); First Report and Order, Amendment of the Commission's Rules To Establish New Personal Communications Services, 8 F.C.C.R. 7162, 7172-75 pp 57-77 (1993) ("Final Preference Order"). The preference entitled Mtel to bypass what had been the traditional mechanism for allocating licenses, through a "comparative hearing," after which the successful applicant would receive a license free of charge. Mtel would instead receive a communications license, specifically a narrowband personal communications service ("PCS") license, without having to face competing applications, and, under the assumptions prevailing when the preference was awarded, without having to pay. Unfortunately for Mtel, Congress drastically changed the background norm for licensing before Mtel could actually receive its license. It amended the Communications Act to allow the Federal Communications Commission to use auctions for allocation of some kinds of licenses (including PCS licenses) when "mutually exclusive applications are accepted for filing," see Omnibus Budget Reconciliation Act of 1993, Pub.L. No. 103-66, § 6002 (codified at 47 U.S.C. § 309(j)), [316 U.S.App.D.C. 224] i.e., on occurrence of the event that formerly would have triggered a comparative hearing. In the case of a pioneer's preference, this condition for licensing via auctions was not satisfied, as the preference gave its holder a pass on any such competition. But as other parties receiving similar licenses would have to pay for them at market rates, the Commission confronted the issue of how to treat Mtel's preference: Should it escape not only competition with other applicants for a license but also the necessity of payment?
 
 
 2
 The Commission originally ruled that Mtel would not be required to pay. Notice of Proposed Rule Making, Review of the Pioneer's Preference Rules, 8 F.C.C.R. 7692, 7694-95 p 18 (1993) ("Pioneer's Preference Review I"); see also First Report and Order, Review of the Pioneer's Preference Rules, 9 F.C.C.R. 605, 610 n. 21 (1994) ("Pioneer's Preference Review II") (reaffirming original determination); Memorandum Opinion and Order, Amendment of the Commission's Rules To Establish New Narrowband Personal Communications Services, 9 F.C.C.R. 1309, 1316 p 45 (1994) ("Narrowband Order") (same). It then reversed itself, requiring payment of what amounted to a substantially discounted auction price--the lesser of "ninety (90) percent of the lowest winning bid for a nationwide narrowband PCS license" and "three million dollars ($3,000,000) less than the lowest winning bid for a nationwide narrowband PCS license." Nationwide Wireless Network Corp., 9 F.C.C.R. 3635, 3639-41 pp 15-20 (1994) ("Licensing Decision").
 
 
 3
 Mtel objects that the Commission lacks statutory authority to impose a payment requirement, and that in any event it failed to engage in reasoned decisionmaking in reaching the determination to impose the payment requirement. We agree with the Commission that it has statutory authority to require payment but find its explanation of imposing the requirement on Mtel inadequate--particularly in its back-of-the-hand treatment of Mtel's argument that its reliance on the preference as originally conceived called for granting a license free of charge. Accordingly, we remand the case to the Commission for reconsideration of Mtel's contentions.
 
 
 4
 In addition, petitioner Mobile Communications Corporation of America ("MobileComm"), an unsuccessful applicant for a pioneer's preference, challenges both the original preference grant and the Licensing Decision, basically on the ground that the Commission failed to provide an adequate basis for its award of a preference and, then, a license to Mtel. We reject these contentions.
 
 
 5
 I. Imposition of a Payment Requirement on Mtel's License
 
 
 6
 A. Jurisdiction Over Mtel's Appeal.
 
 
 7
 Section 402(b)(1) of the Communications Act gives this court jurisdiction over an appeal of a decision or order of the Commission brought by an "applicant for a construction permit or station license, whose application is denied by the Commission." 47 U.S.C. § 402(b)(1). "Station" is defined by the Communications Act as "a station equipped to engage in radio communication or radio transmission of energy," id. § 153(k), and includes mobile as well as land stations. See id. § 531(l ) & (m). Further, § 153 defines "mobile service" in language implying that narrowband PCS is a service involving mobile or land stations or both:
 
 
 8
 (n) "Mobile service" means a radio communication service carried on between mobile stations or receivers and land stations, and by mobile stations communicating among themselves, and includes ... (3) any service for which a license is required in a personal communications service established pursuant to the proceeding entitled "Amendment to the Commission's Rules to Establish New Personal Communications Services" [i.e., the Tentative Preference Order]....
 
 
 9
 Id. § 153(n) (emphasis added). Thus, we have jurisdiction over Mtel's appeal under § 402(b)(1) if, as required by that section, its "application [was] denied by the Commission."
 
 
 10
 If Mtel's application were an application for a license subject to any sort of condition the Commission might choose to impose, then the Licensing Decision would not be a denial of the application; Mtel was granted a [316 U.S.App.D.C. 225] license, though subject to the payment requirement. On the other hand, if, as we think is the case, Mtel was applying for a license of a specific sort --here, one free of charge, as had traditionally been the case--then the Licensing Decision is a denial. Several considerations support this view of Mtel's application. First, it made specific reference to its financial terms, namely the associated administrative fee of $230, implying that it was an application for a license at the price of the administrative fee. Second, interpreting an application as one for a license subject to any condition of the Commission's choosing would permit the Commission to foreclose judicial review of a de facto denial by couching its decision as an approval subject to some intolerable condition. At least it would have this effect unless § 402(a), allowing review under the Hobbs Act, specifically 28 U.S.C. § 2342, of any attack on an order of the Commission under the wire or radio communications chapter of its authority "except those appealable under [§ 402(b) ]," is a general catch-all that picks up anything that falls through the cracks of § 402(b). Whether or not this is true is immaterial for present purposes because Mtel's application is more properly viewed as being for a free license, so that the Commission's order qualifies as a "denial" within the meaning of § 402(b)(1).
 
 
 11
 Nonetheless, a party whose license application has been denied by approval subject to conditions (other than ones requested by the applicant) must normally comply with the applicable administrative exhaustion requirements. These include 47 CFR § 1.110, which states that an approval subject to conditions "shall be considered as a grant of such application unless the applicant" files a timely request "rejecting the grant as made," thereby precipitating Commission reconsideration. Normally failure to comply with this requirement bars judicial review. Central Television, Inc. v. FCC, 834 F.2d 186, 190-91 (D.C.Cir.1987). Here, however, the Commission explicitly waived the § 1.110 requirement, see Licensing Decision, 9 F.C.C.R. at 3644 p 39, thereby negating the basic reason for the requirement of this form of exhaustion--protecting the Commission's interest in crystallizing its position prior to review. See Central Television, 834 F.2d at 191; cf. Darby v. Cisneros, 509 U.S. 137, 141-48, 113 S.Ct. 2539, 2542-45, 125 L.Ed.2d 113 (1993) (agency regulation specifying that party "may request" review of hearing officer's determination did not "require" exhaustion within the meaning of § 10(c) of the APA, 5 U.S.C. § 704).
 
 
 12
 B. Commission's Authority To Impose a Payment Requirement.
 
 
 13
 The Commission based its decision to require payment from Mtel on § 4(i) of the Communications Act, 47 U.S.C. § 154(i), which we have described as the "necessary and proper clause" of the Act. New England Tel. & Tel. Co. v. FCC, 826 F.2d 1101, 1108 (D.C.Cir.1987) (quoting North Am. Telecommunications Ass'n v. FCC, 772 F.2d 1282, 1292 (7th Cir.1985)). Section 4(i) authorizes the Commission to "perform any and all acts, ... and issue such orders, not inconsistent with [the Communications Act], as may be necessary in the execution of its functions." Mtel believes the section inapplicable here.
 
 
 14
 Mtel points first to the specificity of Congress's grants of authority to charge applicants for licenses. Those grants take two forms. The Commission is under an obligation to impose certain administrative fees in connection with the licensing process. See 47 U.S.C. §§ 158, 159. And, as we have seen, the Commission is empowered under the 1993 amendment to the Communications Act to conduct auctions of specified types of licenses where it has accepted competing applications. Mtel offers up the traditional argument that because the statutory scheme "limits a thing to be done in a particular mode, it includes the negative of any other mode." Botany Worsted Mills v. United States, 278 U.S. 282, 289, 49 S.Ct. 129, 132, 73 L.Ed. 379 (1929). Thus, the payment requirement is "inconsistent with" the Communications Act and not within the Commission's power under § 4(i).
 
 
 15
 We agree with the Commission, however, that Mtel's reliance on the expressio unius maxim--that the expression of one is the exclusion of others--is misplaced. The maxim "has little force in the administrative [316 U.S.App.D.C. 226] setting," where we defer to an agency's interpretation of a statute unless Congress has " 'directly spoken to the precise question at issue.' " Texas Rural Legal Aid, Inc. v. Legal Serv. Corp., 940 F.2d 685, 694 (D.C.Cir.1991) (quoting Chevron U.S.A. v. NRDC, 467 U.S. 837, 842, 104 S.Ct. 2778, 2781, 81 L.Ed.2d 694 (1984)). Expressio unius "is simply too thin a reed to support the conclusion that Congress has clearly resolved [an] issue." Id.; see also Cheney R.R. Co. v. ICC, 902 F.2d 66, 68-69 (D.C.Cir.1990) (similar). Indeed, we think the nature of Congress's auction authorization more supports than undermines the Commission's decision here. See Texas Rural Legal Aid, 940 F.2d at 694 ("[A] congressional prohibition of particular conduct may actually support the view that the administrative entity can exercise its authority to eliminate a similar danger.").
 
 
 16
 The event Congress identified as justifying auctions--the acceptance of mutually exclusive applications--normally defines the type of license where an auction makes sense: In such cases, there is every reason to believe that the entitlement that the Commission has carved out from de facto ownership by the general public is quite valuable. Thus, an auction will yield reimbursement to the public for the transfer of the entitlement; it will save the public and private expense involved in a comparative hearing; and, because the party able to use the license most efficiently will be able to bid the most, the license will end up in the hands of the firm best able to develop its potential. See H.R.Rep. No. 111, 1st Sess. U.S.Code Cong. & Admin.News 1993, pp. 378, 767, 1993 WL 181528, at * 535 (listing, as goals of auction regime, "promot[ing] the development ... of new technologies ... without administrative or judicial delays" and "promot[ing] economic opportunity and competition"); 139 Cong.Rec. S1437-38 (1993) (statement of Sen. Inouye introducing original version of auction legislation) (referring to goals of "promot[ing] economic efficiency, reduc[ing] the administrative burden of issuing licenses, and allow[ing] the Government to receive significant revenues from the use of this public asset"); id. S1442 (statement of Sen. Stevens, co-sponsor of the original auction legislation) (similar). By contrast, in the typical case where mutually exclusive applications are not accepted, the license would have negligible value, there would be no need for any comparative hearing (much less a costly one), and the selection of the license recipient would be a foregone conclusion. The license sought by Mtel clearly fits the first set of cases, where the principles supporting an auction are powerful; indeed, but for the Commission's pioneer's preference policy, that license clearly would have fit Congress's criteria for an auction. Mtel is therefore in essence asking us to read congressional intent as follows: Because the Commission before the 1993 amendment of the Communications Act had provided for an exception to what was then its only way of issuing licenses for which there was competition, Congress forbade it from qualifying that exception, even where doing so would enable the Commission to reap many of the benefits of Congress's own new policy--including obtaining reimbursement for the transfer of a valuable entitlement. We think such a reading untenable.
 
 
 17
 To put the same point slightly differently: The pioneer's preference itself was a creation of the Commission, not an act of subservience to a mandate of Congress. But the congressional provision for auctions sharply widened the incremental benefit accruing to a preference, vis-a-vis other would-be license holders. Before, the preference recipient enjoyed an assured free license, while its competitors enjoyed a chance at a free license; after Congress's provision for auctions, and in the absence of a decision to charge a preference recipient, the recipient would enjoy an assured free license, while its competitors enjoyed only a chance to buy a license at the market price (i.e., by paying the government for all the estimated economic rents attributable to the license). This change in the relation between preference recipients and other would-be license holders might properly have led the Commission to drop the preference altogether (at least if it had adequately taken into account reliance interests based on the prior policy); instead the Commission adjusted the terms of the preference to reduce the gulf between recipients of preferences and other license aspirants.
 
 
 18
 [316 U.S.App.D.C. 227] Contrary to Mtel's contention, our decision inRailway Labor Executives' Ass'n v. Nat'l Mediation Bd., 29 F.3d 655 (D.C.Cir.1994) (en banc), did not enshrine expressio unius as a maxim of universal and conclusive application. The conclusion in RLEA that the agency lacked authority for its action followed a careful exegesis of the entire statutory context, the statute's legislative history, and the agency's unvarying practice over a 60-year history. Id. at 664-71. In the very different context of the case before us, we see no conflict between the language and structure of the Communications Act and the imposition of a payment requirement on Mtel.[1]
 
 
 19
 Mtel argues that even if requiring payment is not directly "inconsistent with" the Communications Act, the lack of affirmative statutory support for the Commission's action proves that it was not "necessary in the execution of [the Commission's] functions" under the Act, as required by § 4(i). In imposing the payment requirement, the Commission relied on its duty to determine "whether the public interest, convenience, and necessity will be served" by the granting of a license application. 47 U.S.C. § 309(a); Licensing Decision, 9 F.C.C.R. at 3639 p 15 & n. 53. In light of that requirement, the payment condition would be "necessary in the execution of [the Commission's] functions" under § 4(i) so long as the Commission properly found it necessary to "ensure the achievement of the Commission's statutory responsibilit[y]" to grant a license only where the grant would serve the public interest, convenience, and necessity. FCC v. Midwest Video Corp., 440 U.S. 689, 706, 99 S.Ct. 1435, 1444-45, 59 L.Ed.2d 692 (1979) (citing United States v. Southwestern Cable Co., 392 U.S. 157, 88 S.Ct. 1994, 20 L.Ed.2d 1001 (1968)); see also Southwestern, 392 U.S. at 180 n. 46, 88 S.Ct. at 2006 n. 46 (relying on § 4(i) as basis for Commission's authority to act in furtherance of its statutory purpose). We accord substantial deference to "the Commission's judgment regarding how the public interest is best served." FCC v. WNCN Listeners Guild, 450 U.S. 582, 596, 101 S.Ct. 1266, 1275, 67 L.Ed.2d 521 (1981). Here, a finding of the required sort might rest on the unjust enrichment of Mtel from receipt of a free license while, under the new auction regime, others would be required to pay, or (less plausibly) on the prospect of predation by a deep-pocketed Mtel, flush with its free license--both concerns alluded to by the Commission in its Licensing Decision. See 9 F.C.C.R. at 3639-40 pp 15-18. Thus, the Commission's present reasoning, coupled with an adequate response to Mtel's special objections discussed in part I.C. below, would support a finding that the payment requirement is "necessary in the execution of [the Commission's] functions."
 
 
 20
 Mtel suggests that this conclusion is belied by Congress's amendment of the Communications Act to authorize auctions of communications licenses. It argues that if the Commission could charge Mtel for its license (apart from the nominal administrative fees) in the absence of explicit statutory authorization, then amendment of the Act to authorize charges would have been unnecessary. But the amendment of the Communications Act necessarily alters any analysis of what is in the "public interest," which is not an issue of abstract political economy but of fulfilling the congressional view of the public interest. Thus, assessment of whether imposition of a [316 U.S.App.D.C. 228] charge advances the public interest was quite different against the backdrop of the traditional comparative hearing procedure for allocating licenses than it is against the backdrop of the new auction regime. We are therefore unpersuaded by Mtel's argument that the Commission lacks affirmative authority to impose a payment requirement on Mtel.
 
 
 21
 C. Failure To Give Adequate Consideration to Mtel's Reliance Interests.
 
 
 22
 Mtel argues that the Commission failed to engage in reasoned decision-making in deciding to impose the payment requirement, and we agree. Given the route by which the Commission reached its decision, the inadequacy is unsurprising. After stating repeatedly that Mtel would not be required to pay, the Commission reversed itself at the eleventh hour. Because the issue appeared settled prior to the Licensing Decision's announcement of the reversal, Mtel did not offer--and thus the Commission did not consider--arguments that imposing a payment requirement would be against the public interest. Mtel's submission to the Commission stated simply--and quite accurately--that "the question of whether Mtel should be required to pay auction level fees [was] addressed on reconsideration in the Narrowband PCS proceeding [Narrowband Order, 9 F.C.C.R. at 1316 p 45], as well as extrajudicially in the Pioneer's Preference review proceeding [Pioneer's Preference Review II, 8 F.C.C.R. at 7694-95 p 18]." Opposition of Mtel, Nationwide Wireless Network Corp., Docket No. 22888-CD-P/L-94. When the Commission reversed course, it failed to address such questions as whether its new position was consistent with the reliance interests of Mtel or with the Commission's decision not to charge for certain other paging system licenses.[2]
 
 
 23
 The Commission did address itself to reliance interests of pioneer's preference recipients in a related proceeding--concerned with the payment obligations of broadband pioneers. See Memorandum Opinion and Order on Remand, Amendment of the Commission's Rules To Establish New Personal Communications Services, 9 F.C.C.R. 4055, 4059 p 17 (1994). The pioneers there argued that the public interest would be best served by granting them "free licenses as a reward for investments and disclosure of information they have made in reliance on their expectation of a preference." Id. The Commission rejected this argument, saying that there was no evidence in the record to suggest that the pioneers would not have made the investment and information disclosure if they had known they would have to pay for their licenses. Id. But Mtel has had no opportunity to put forth arguments and evidence on the question of reliance, having been lulled into a false sense of security by the Commission's repeated disavowal of intent to charge Mtel. See Pioneer's Preference Review I, 8 F.C.C.R. at 7694-95 p 18; Pioneer's Preference Review II, 9 F.C.C.R. at 610 n. 21; Narrowband Order, 9 F.C.C.R. at 1316 p 45. We think Mtel is entitled to an opportunity to state its reliance concerns and to have the Commission address whatever Mtel may say.
 
 
 24
 Mtel also suggests that the Commission has undercut its own case for charging Mtel by its contrary decision as to certain other paging system licenses. The Commission notes several distinctions between these licenses and the one granted to Mtel, see Response of FCC to Post-Argument Submission of Mtel, but did not do so in the Licensing Decision, where the surprise move to require payment was made. Accordingly, we remand the case to the Commission for consideration of these issues. See SEC v. Chenery Corp., 318 U.S. 80, 93-94, 63 S.Ct. 454, 461-62, 87 L.Ed. 626 (1943).
 
 II. Grant of Preference and License to Mtel
 
 25
 While Mtel challenges the imposition of a payment condition on its license, MobileComm [316 U.S.App.D.C. 229] challenges the grant of both the pioneer's preference and the license to Mtel. We address and reject these claims in turn.
 
 
 26
 A. Grant of a Preference to Mtel.
 
 
 27
 MobileComm's challenge to the preference grant may be viewed as an attack on the grant of a license, which the pioneer's preference was intended to "guarantee," see Report and Order, Establishment of Procedures To Provide a Preference to Applicants Proposing an Allocation for New Services, 6 F.C.C.R. 3488, 3492 p 32 (1991) ("Pioneer's Preference Order"), and thus within our jurisdiction under 47 U.S.C. § 402(b)(6), which provides for review at the behest of persons aggrieved by the grant or denial of a license application. Alternatively, the challenge may be viewed as an attack on an order not appealable under § 402(b) and thus within our jurisdiction under § 402(a) and 28 U.S.C. § 2342(1). There being no other apparent possibilities, and the timing and venue provisions of both subsections being satisfied, we have jurisdiction.
 
 
 28
 According to MobileComm, the Commission, in granting a preference to Mtel, failed to provide an adequate justification for the grant and thus behaved in an arbitrary and capricious fashion in violation of § 10(e)(B)(1) of the Administrative Procedure Act, 5 U.S.C. § 706(2)(A). Under that section, we must set aside the Commission's action if the Commission failed to "articulate a satisfactory explanation for its action" or reached a conclusion "so implausible that it could not be ascribed to a difference in view or the product of agency expertise." Motor Vehicle Mfrs. Ass'n v. State Farm Mutual Auto. Ins. Co., 463 U.S. 29, 43, 103 S.Ct. 2856, 2867, 77 L.Ed.2d 443 (1983).[3]
 
 
 29
 The Commission adopted its pioneer's preference rules in order to encourage and reward the development of new and innovative communications services. See Notice of Proposed Rule Making, Establishment of Procedures To Provide a Preference to Applicants Proposing an Allocation for New Services, 5 F.C.C.R. 2766, 2766-67 pp 1-5 (1990); Pioneer's Preference Order, 6 F.C.C.R. at 3488 p 1. Here, it granted a preference to Mtel on the basis of its having "developed ... what [Mtel] has named 'Multi-Carrier Modulation' ("MCM") technology that is capable of transmitting 24 kilobits per second simulcast in a single 50 kHz channel." See Tentative Preference Order, 7 F.C.C.R. at 5735 p 149; see also Licensing Decision, 9 F.C.C.R. at 3644 p 41 (reiterating basis for preference award). In its effort to show that the Commission's explanation was defective, MobileComm attempts to recast the award as one based on Mtel's use of two specific MCM technologies, "MOOK" and "PSFK." In fact the Commission never explained why MOOK or PSFK might deserve a preference, for the simple reason that it never rested the award on those technologies. Indeed, it never mentioned MOOK or PSFK in its explanation for making the preference award. See Tentative Preference Order, 7 F.C.C.R. at 5735 p 149; Final Preference Order, 8 F.C.C.R. at 7172-75 pp 57-77. Furthermore, Mtel said in its preference application that it was "experimenting with " MOOK and PSFK, as well as with "an innovative FM multitone modulation technique," and that it did not want to tie itself to MOOK or any other specific MCM technology. See Mtel's Petition for Rulemaking, Mobile Telecommunication Technologies Corp., ET Docket No. 92-100 (emphasis added); Mtel's Technical Feasibility Demonstration, Mobile Telecommunications Technologies Corp., ET Docket No. 92-100. Thus, the preference award clearly rested, as the Commission said, on Mtel's having developed and applied MCM technology in a simulcast environment. See Tentative Preference Order, 7 F.C.C.R. at 5735 p 149; Final Preference Order, 8 F.C.C.R. at 7174 p 68. The Commission cannot be faulted for failing to justify a decision it never made.
 
 
 30
 MobileComm also contends that one cannot understand the award to have been [316 U.S.App.D.C. 230] based, as the Commission said, on the development and application of MCM technology in a simulcast environment, because, it says, the Commission failed to answer its claims that Mtel's proposed integration of MCM technology and simulcast paging was neither "new" nor "innovative." See MobileComm's Narrowband PCS Pioneer's Preference Comments, Amendment of the Commission's Rules To Establish New Personal Communications Services, ET Docket No. 92-100. In fact the Commission responded at some length. See Final Preference Order, 8 F.C.C.R. at 7173-75 pp 64-74; see also Tentative Preference Order, 7 F.C.C.R. at 5737-38 p 150. When a party seeks to persuade a non-technical court of the inadequacies of a specialized agency's treatment of a highly technical issue, its burden, as a practical matter, is necessarily quite heavy. Here MobileComm has not begun to pinpoint gaps in the Commission's response that this court could characterize as material.
 
 
 31
 Finally, MobileComm argues that the Commission's decision to base the preference grant on Mtel's integration of MCM and simulcast paging, rather than on the development and use of specific MCM technologies such as MOOK and PSFK, will "vitiat[e] the FCC's intent and [give] Mtel an opening to use a range of technologies that did not form the basis for the preference award." Brief of Petitioner at 16. The argument seems to be that the apparently broad basis for the preference grant may limit the force of the Commission's requirement that Mtel use the technology on which the preference is based. Narrowband Order, 9 F.C.C.R. at 1316 pp 46-48. But MobileComm at most identifies a practical issue the Commission will confront in enforcing the preference's limits. We are in no position to say the Commission was arbitrary or capricious in its choice of the level of generality at which to define the preference-winning technology.
 
 
 32
 B. License Grant.
 
 
 33
 MobileComm recasts its last objection to the preference grant as a challenge under 47 U.S.C. § 402(b)(6) to the Licensing Decision, saying that the Commission failed to respond adequately to its claim that Mtel did not intend to use the technology on which Mtel's preference was based. As to this contention, the Commission found that MobileComm had not raised any substantial and material question of fact, a finding that (if correct) would justify, under 47 U.S.C. § 309(d)(2), the denial of MobileComm's petition to deny Mtel a license. In fact the claims raised by MobileComm were no more than a regurgitation of its previous argument about the technological basis of Mtel's preference. In the licensing venue, MobileComm pointed to various clues that Mtel would not use the MOOK and PSFK modulation techniques that, according to MobileComm but no one else, were the foundation of Mtel's preference. See Licensing Decision, 9 F.C.C.R. at 3644 p 41; MobileComm's Petition To Deny, Nationwide Wireless Network Corp., File No. 22888-CD-P/L-94; id. Att. C. As we have seen, however, the Commission based the grant of a preference to Mtel on its having developed and applied MCM technology in a simulcast environment, not on its having developed any specific MCM technique. Thus the Commission was quite correct in concluding that MobileComm's evidence about Mtel's possible non-use of MOOK and PSFK created no substantial and material question of fact under § 309(d)(2). For the same reason, the Commission "articulate[d] a satisfactory explanation for its action" under 5 U.S.C. § 706(2)(A). See Motor Vehicle Mfrs. Ass'n, 463 U.S. at 43, 103 S.Ct. at 2866.
 
 
 34
 Its substantive point being feeble, MobileComm endeavors to ensnare the Commission, Mtel and the court in a procedural jumble that turns out to be completely irrelevant. The Communications Act's provision on petitions to deny a license application, § 309(d), is divided into two subsections, which we have read as assigning distinct tasks to the Commission. We have described subsection (1) as instructing the Commission to determine whether a petition to deny sets forth "specific allegations of fact sufficient to show that ... a grant of the application would be prima facie inconsistent with subsection (a) of this section [requiring that granting the application serve the public interest, convenience, and necessity]," and subsection (2) as telling the Commission (if [316 U.S.App.D.C. 231] the first "requirement" is met) to consider whether "on the basis of the application, the pleadings filed, or other matters which [the Commission] may officially notice," "a substantial and material question of fact is presented." Citizens for Jazz on WRVR v. FCC, 775 F.2d 392, 394 (D.C.Cir.1985). MobileComm says that the Commission failed to perform step one of this process.
 
 
 35
 In the first place we note that, despite Citizens for Jazz, we are unable to identify any words in § 309(d)(1) itself that assign any task at all to the Commission. On their face, the words say simply that the petitioner is to do various things, against a background set of ancillary rules about the Commission's power to set time limits and the applicant's opportunity to respond. The Commission comes into the picture in § 309(d)(2), which specifies how it is to handle the materials produced under subsection (1). If it finds that no "substantial and material question of fact is presented," it is to deny the petition and make the grant, and that, as we have seen, is just what the Commission did (with, of course, the added wrinkle that the grant was conditioned).
 
 
 36
 Nevertheless, it is quite true that in Citizens for Jazz we construed § 309(d) as establishing a two-step process. But we have never said that the Commission must plod through the two steps on pain of being reversed. Quite the opposite. In Citizens for Jazz we noted that § 309(d) determinations
 
 
 37
 "are typically made concurrently: Whether the petition to deny meets the statutory requirements [and] whether the application under consideration raises a factual issue substantial enough to call for a hearing ... are discussed in the same opinion--if, indeed, they are discussed separately at all, which is rarely, since a negative resolution of the second question alone makes the first question moot...."
 
 
 38
 Citizens for Jazz, 775 F.2d at 396 (first emphasis in original; second emphasis added). This, of course, is exactly what happened here.
 
 
 39
 Astroline Communications Co. v. FCC, 857 F.2d 1556, 1562 (D.C.Cir.1988), is not to the contrary. While we stressed the importance of the two-step process, we did not reverse any conclusion of the Commission based on its failure to perform step one. On none of the four issues to be addressed by the Commission on remand had it performed a proper analysis under step two that would have mooted the supposed error under step one. See Astroline, 857 F.2d at 1567 (first issue) ("unrefuted factual record" belied Commission's conclusion that the petitioner had presented no substantial and material question of fact); id. at 1570 (second issue) (Commission "failed to articulate adequately its reasons" for concluding that no substantial and material question of fact was presented); id. at 1572 (third issue) (Commission's conclusion that petitioner had failed to raise a substantial and material question of fact was potentially arbitrary and capricious when viewed in light of substantial issue raised in the petition as to de facto control of applicant); id. at 1572-73 (fourth issue) (although decision under step one was not arbitrary or capricious viewed in isolation, context of "persistent misapplication of the statutory mandate" called for a remand, there being no step-two decision at all).
 
 
 40
 * * *
 
 
 41
 Accordingly, the case is remanded to the Commission for consideration of whether Mtel's license should be conditioned on payment in light of its claims of reliance and inconsistent treatment of others. In all other respects the petitions for review are denied.
 
 
 42
 So ordered.
 
 
 43
 HARRY T. EDWARDS, Chief Judge, dissenting in part and concurring in part:
 
 
 44
 I agree with the majority that the Federal Communications Commission ("FCC" or "Commission") failed to engage in reasoned decision-making in reaching a determination to require Mobile Telecommunications Technologies Corporation ("Mtel") to pay over $33 million for a license to operate a narrowband personal communications service. As the majority correctly holds, the FCC's "back-of-the-hand treatment" of Mtel surely cannot survive judicial review. However, the FCC's flippant and unreasoned treatment of Mtel is the least of its sins. On the record before us, [316 U.S.App.D.C. 232] it is clear that the Commission lacked statutory authority to require Mtel to pay for the license at issue, so there was no legal basis for the action taken. Accordingly, I believe that we must reverse the Commission's action and grant the relief sought by Mtel. In all other respects, I concur in the judgment of the majority.
 
 
 
 This case involves a small corporation, Mtel, and its efforts to develop and market a two-way data communications service that promised to improve existing data transmission rates by a factor of ten. Mtel invested approximately $50 million in developing this service; its reward was a "pioneer's preference" grant from the FCC that, in the words of the agency, was to be the equivalent of a guarantee of a license to operate its new service.[1] In granting Mtel a pioneer's preference, the FCC applauded Mtel for "solv[ing] significant technical engineering problems" that had stumped its competitors, and described the company's work as "a significant communications innovation of the sort the Commission established the pioneer's preference rules to recognize."[2] On February 3, 1994, after consideration of comments regarding Mtel's receipt of a pioneer's preference, the FCC invited Mtel to apply for a license based on its pioneer's preference.[3]
 At all times during consideration of Mtel's pioneer's preference (a process that spanned more than two years), the FCC repeatedly assured Mtel that the license it needed to operate its pioneer's preference technology would be issued for no charge other than the nominal statutory fee due from all licensees. However, at the last stage of the pioneer's preference licensing process, when all that remained was for the FCC to issue a license to Mtel, the Commission suddenly reversed course and made an entirely unprecedented determination that Mtel should be required to pay a fee of over $33 million for its license. Because the FCC has no basis for demanding this payment from Mtel, I must dissent.
 
 
 
 45
 There is no dispute that, while Mtel's pioneer's preference and licensing proceedings were underway, dramatic changes were being made in the FCC's operations; however, none of these changes gave the FCC the authority to extort a multi-million-dollar payment from Mtel. Mtel filed for a pioneer's preference in November 1991; the FCC adopted a tentative finding that Mtel's application was successful in July 1992, and affirmed this decision in an order adopted in June 1993. Then, in August 1993, while reconsideration of Mtel's pioneer's preference was underway, the FCC for the first time received permission from Congress to auction spectrum licenses at market value.[4] This right was a major development for an agency that, for almost sixty years, had been confined by statute to charging nominal license fees.
 
 
 46
 Even though pioneer's preference licenses were not affected by the 1993 change in the law,[5] the FCC sought to evaluate its pioneer's preference program under the auction framework. Part of this evaluation involved consideration of whether the auction process would be adversely affected if pioneer's preference licenses were awarded for nominal fees. Throughout this process, the FCC repeatedly [316 U.S.App.D.C. 233] confirmed that Mtel would not be subjected to auction-based fees. The FCC noted that, because Mtel's pioneer's preference had already been granted at the time that Congress gave the Commission auction authority, it would be inequitable to charge Mtel an auction-based fee.[6] Thus, before Mtel applied for the license to operate its pioneer's preference technology in February 1994, the FCC had assured the company on several occasions that, not only would it not be charged a market-value fee for its license, but also that the FCC recognized that the imposition of any such fee would be inequitable.
 
 
 47
 The FCC got weak-kneed and turned tail on Mtel when a member of Congress cried "wolf." In May of 1994, Congressman John D. Dingell sent a letter to the FCC's General Counsel intimating that pioneer's preference recipients should pay for their licenses;[7] he also proposed legislation to that effect, which would have subjected pioneer's preference licensees to a charge equal to 90% of the highest auction price of similar licenses.[8] This legislation was never enacted, but Congressman Dingell's threats apparently succeeded: in July 1994, when the FCC issued Mtel's final licensing order, the Commission suddenly reversed course and essentially adopted Congressman Dingell's suggestion by requiring Mtel to pay 90% of the lowest auction price of similar licenses. The results of an auction conducted shortly thereafter set this amount at $33.3 million.[9]
 
 
 48
 Recognizing that it had repeatedly promised Mtel a "free" license, and that it had on numerous occasions expounded on the inequity of charging Mtel an auction-based license fee, the Commission was forced to explain its about-face. Not surprisingly, no good explanation was forthcoming. The best the Commission could offer was an obtuse discussion regarding its evolving understanding of the auction process accompanied by an unsupported suggestion that Mtel's "free" license might possibly harm the auction market.[10] The FCC summarized its changed position by declaring that "previously we overvalued ... equities [favoring Mtel] and undervalued the countervailing competitive concerns."[11] At the end of the FCC's new "valuation," Mtel was the party that ended up short, by over $33 million.
 
 
 49
 [316 U.S.App.D.C. 234] Not only did the FCC fail to justify the inequitable action taken against Mtel, it also failed to locate a statutory basis for the fee Mtel was to pay. It is undisputed that the FCC has never before in its history imposed a licensing fee absent explicit authorization from Congress. It is also conceded that there is no such authorization in this case. Obviously, the FCC could not rely on Representative Dingell's proposed but unenacted legislation as authority for its sudden decision to charge Mtel. In the absence of statutory authorization for the fee it sought to impose, the FCC concocted an argument to support its action by bridging together its general authority to administer the Communications Act, found in 47 U.S.C. § 154(i) ("section 4(i)"), and the auction framework that Congress established in 1993 to govern non-pioneer's preference licensees in 47 U.S.C. § 309(j) ("section 309(j)"). Charitably speaking, the argument is something akin to the FCC saying that it "has the power to do whatever it pleases merely by virtue of its existence," a suggestion that this court normally would view as "incredible." Railway Labor Executives' Ass'n v. National Mediation Bd., 29 F.3d 655, 659 (D.C.Cir.1994) (en banc), cert. denied, --- U.S. ----, 115 S.Ct. 1392, 131 L.Ed.2d 243 (1995).
 
 
 50
 Congress apparently did not share such an expansive view of the FCC's authority under the existing law, because, in late 1994, it decided to pass a statute specifically authorizing the FCC to collect fees from pioneer's preference license recipients.[12] Under any other circumstances, Mtel would likely have celebrated this legislation, because the effective date of the provision served to exclude Mtel's pioneer's preference license from the new fees.[13] However, the FCC's decision to charge Mtel a fee a few months earlier, irrespective of whether Congress had authorized such a payment, deprived Mtel of the exemption Congress provided.
 
 
 51
 Counsel for the FCC conceded at oral argument that neither of the sections upon which the FCC relies permit it to charge Mtel a fee: section 4(i), which speaks in general terms, does not alone authorize the imposition of such a fee, and it is clear that section 309(j) does not permit a fee in Mtel's case. Thus, the FCC claims that, because it has general authority over the communications industry and because it can assess fees to parties other than Mtel, it is therefore free to charge Mtel as well. As noted above, this kind of argument was rejected in Railway Labor Executives' Association where the en banc court categorically dismissed the idea that an agency "possesses plenary authority to act within a given area simply because Congress has endowed it with some authority to act in that area." 29 F.3d at 670. Under the FCC's logic, as soon as Congress grants the agency permission to engage in certain conduct, such as charging market-value license fees, on an explicitly-defined basis, section 4(i) automatically confers the right to apply that power across the board. If this reading were correct, it would completely eviscerate the power of Congress to determine the scope of the statutes it passes. As this court has held, "it is beyond cavil that 'an agency's power is no greater than that delegated to it by Congress,' " Id. (quoting Lyng v. Payne, 476 U.S. 926, 937, 106 S.Ct. 2333, 2341, 90 L.Ed.2d 921 (1986)), and "[t]he duty to act under certain carefully defined circumstances does not subsume the discretion to act under other, wholly different, circumstances, unless the statute bears such a reading," id. at 671.
 
 
 52
 Even if I were to assume the fallacious premise that section 4(i) could bestow upon the FCC the authority to charge Mtel for its license, there is no indication that the charge is "necessary" to the FCC's functions. The Commission's justification for the charge is that granting Mtel a free license could harm the public interest by jeopardizing competition in the communications industry. This justification is belied by the fact that the [316 U.S.App.D.C. 235] FCC is presently awarding licenses to competitors of Mtel with no such fee attached.[14]
 
 
 53
 Further, Mtel and other pioneer's preference applicants made large investments in research and development of new products in reliance on the pioneer's preference framework as it existed before the FCC's auction authority. Mtel asserts that it continued to invest in improving the capabilities of its system after the pioneer's preference was granted.[15] Only an extraordinarily naive person could believe that the FCC's repeated promises that Mtel would not be charged an auction-based license fee did not affect Mtel's allocation of its resources to this endeavor.
 
 
 54
 At oral argument, counsel for the FCC was disinclined to address the agency's various guarantees that Mtel would not be charged an auction-based fee.[16] There was nothing of substance for him to offer by way of explanation, so counsel's reluctance was savvy. Nonetheless, counsel's inability to respond in no way obscures the obvious: in addition to being lawless, the FCC's action in this case borders on outrageous. I dissent.
 
 
 
 *
 Circuit Judges Henderson and Randolph did not participate in the order for rehearing in banc
 
 
 [1]
 Congress further amended the regime for auctioning licenses after the Commission had issued the Licensing Decision. See Dissent at 1413; Uruguay Round Agreements Act, Pub.L. No. 103-465, § 801 (1994) (codified at 47 U.S.C. § 309(j)(13)). It is not clear to us how the later legislative developments would shed light on the pre-existing legal situation, but even assuming they could, they do not do so here. The amendment required--as opposed to merely authorizing--the Commission to charge for future licenses issued to pioneer's preference recipients at rates discounted under a statutorily specified formula. See Uruguay Round Agreements Act § 801 (codified at 47 U.S.C. § 309(j)(13)(A) & (B)). Congress also required that preference recipients of certain already-awarded broadband licenses be charged for their licenses. See id. (codified at 47 U.S.C. § 309(j)(13)(E)). Congress was silent about the treatment of narrowband license recipients such as Mtel. Thus, if one were to infer from the amendment that congressional intent may have been in some way different with respect to already-issued narrowband licenses than with respect to licenses to which the amendment spoke, then the Commission's decision--that it was authorized but not directed to charge--would nevertheless be consistent with the amendment
 
 
 [2]
 The mere fact that the Commission reversed its position in an adjudicatory proceeding after announcing its initial view in a rule-making proceeding (without, however, actually promulgating a rule on the matter) does not invalidate the shift, contrary to Mtel's contention. "An agency's view of what is in the public interest may change, either with or without a change in circumstances," as long as the agency "suppl[ies] a reasoned analysis indicating that prior policies and standards are being deliberately changed, not casually ignored." Greater Boston Television Corp. v. FCC, 444 F.2d 841, 852 (D.C.Cir.1970) (footnotes omitted)
 
 
 [3]
 MobileComm also argues that the Commission violated § 309(d) of the Communications Act, 47 U.S.C. § 309(d), in granting Mtel's preference request. We need not decide whether § 309(d), which governs contested license grants, applies to the grant of a pioneer's preference; MobileComm's argument under § 309(d)--that the Commission failed to specify the basis for its decision--is the same as its argument under the APA
 
 
 [1]
 See Establishment of Procedures to Provide a Preference to Applicants Proposing an Allocation for New Services, 6 F.C.C.R. 3488, 3492 p 32 (1991) (report and order)
 
 
 [2]
 Amendment of the Commission's Rules to Establish New Narrowband Personal Communications Services, 8 F.C.C.R. 7162, 7174 pp 72-73 (1993) (first report and order)
 
 
 [3]
 See Commission Invites Filing of Narrowband Personal Communications Service Pioneer's Preference Application, FCC Public Notice (Feb. 3, 1994), reprinted in Joint Appendix ("J.A.") 672
 
 
 [4]
 See 47 U.S.C. § 309(j) (Supp. V 1993)
 
 
 [5]
 See 47 U.S.C. § 309(j)(6)(G) (Supp. V 1993) ("Nothing ... in the use of competitive bidding, shall ... be construed to prevent the Commission from awarding licenses to those persons who make significant contributions to the development of a new telecommunications service or technology...."); H.R.REP. NO. 111, 103d Cong., 1st Sess. 257 (1993) U.S.Code Cong. & Admin.News 1993, pp. 378, 584. ("The provisions of section 309(j) are ... expressly neutral with respect to [pioneer's preference] policies.")
 
 
 [6]
 See Review of the Pioneer's Preference Rules, 8 F.C.C.R. 7692, 7694-95 p 18 & n. 19 (1993) (notice of proposed rulemaking) ("[I]t would be inequitable to apply any change in our rules in [Mtel's] pioneer's preference proceeding."); Review of the Pioneer's Preference Rules, 9 F.C.C.R. 605, 610 p 9 & n. 21 (1993) (first report and order) ("We previously determined that, as a matter of equity, nothing in our pioneer's preference review will affect [Mtel's] proceeding, and we adhere to that decision."); Amendment of the Commission's Rules to Establish New Narrowband Personal Communications Services, 9 F.C.C.R. 1309, 1316 p 45 (1994) (memorandum opinion and order) ("We continue to believe that as a matter of equity we should not apply any new pioneer's preference rules in this proceeding, because a final order addressed the preference prior to enactment of the 1993 Budget Reconciliation Act. Accordingly, except for our normal established fees, we will not charge Mtel for the license that it may receive pursuant to its preference grant.")
 Although the FCC did not specifically address whether Mtel had relied on the existing pioneer's preference framework in pursuing its application, the FCC did observe that other, similarly situated pioneer's preference recipients submitted pioneer's preference requests and "publicly disclosed substantial detail of their system designs in reliance on the continued applicability of the pioneer's preference rules." Review of the Pioneer's Preference Rules, 9 F.C.C.R. 605, 610 p 9 (1993) (first report and order). The FCC also noted that, "[h]ad the rules been different, these applicants might have structured their requests differently; or conducted research, development, and experimentation differently; or elected not to disclose detailed information about their systems." Id.
 
 
 [7]
 See Letter from John D. Dingell, Chairman, House Subcomm. on Oversight and Investigations of the Comm. on Energy and Commerce, to William Kenard, General Counsel, FCC (May 3, 1994), reprinted in J.A. 902-08
 
 
 [8]
 See H.R. 4700, 103d Cong., 2d Sess. (1994)
 
 
 [9]
 The FCC's licensing order required Mtel to pay 90% of the lowest winning bid for a narrowband personal communications service license, or $3,000,000 less than the lowest winning bid for such a license, whichever was less. See Nationwide Wireless Network Corp., 9 F.C.C.R. 3635, 3646 p 50(4) (1994) (memorandum opinion and order). As it turned out, the lesser of these options was for Mtel to pay 90% of the lowest auction bid, or $33.3 million
 
 
 [10]
 See id. at 3640 pp 17-19
 
 
 [11]
 Id. at 3640 p 19
 
 
 [12]
 See 47 U.S.C.A. § 309(j)(13)(B) (Supp.1995). This provision sets forth a very detailed formula by which the FCC is to compute the fee that pioneer's preference license recipients are to pay
 
 
 [13]
 As the FCC has acknowledged, the pioneer's preference payment statute does " 'not apply to applications that have been accepted for filing on or before September 1, 1994.' " Brief for Appellee at 18 (quoting 47 U.S.C. § 309(j)(13)(D)(iv)). Mtel's license was issued in July 1994, subject to the disputed fee
 
 
 [14]
 As the majority concedes, Mtel has submitted information indicating that the FCC has recently issued paging licenses without subjecting the recipients to auction-based fees
 
 
 [15]
 See, e.g., Letter from R. Michael Senkowski & Eric W. DeSilva, counsel for Mtel to William Caton, Acting Secretary, FCC 3 (Apr. 26, 1994), reprinted in J.A. 879 ("Mtel has kept its commitments to the Commission by strengthening its financing and improving the service's technological capabilities since the award was made.")
 
 
 [16]
 Transcript of Oral Argument at 28